**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.: _____

ALTITUDE SPORTS & ENTERTAINMENT, LLC,

       Plaintiff,

v.

COMCAST CORPORATION and
COMCAST CABLE COMMUNICATIONS, LLC,

       Defendants.

---

**PLAINTIFF'S COMPLAINT
DEMAND FOR JURY TRIAL**

---

KEVIN D. EVANS
(kdevans@armstrongteasdale.com)
ARMONSRONG TEASDALE
4643 S. Ulster Street, Ste. 800
Denver, CO 80237
Telephone: (720) 200-0676
Fax: (720) 200-0676

WILLIAM A. ISAACSON
(wisaacson@bsfllp.com)
AMY J. MAUSER
(amauser@bsfllp.com)
ROBERT M. COOPER
(rcooper@bsfllp.com)
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, NW
Washington, DC 20005
Telephone: (202) 237-2727
Fax: (202) 237-6131

SEAN RODRIGUEZ
(srodriguez@bsfllp.com)
BOIES SCHILLER FLEXNER LLP
44 Montgomery Street, 41st Floor
San Francisco, CA 94104
Telephone: (415) 293-6800
Fax: (415) 293-6899

*Attorneys for Plaintiff Altitude Sports & Entertainment, LLC f/k/a KSE Media Ventures, LLC*

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS.................................................................................................. i

NATURE OF THE CASE ............................................................................................... 1

JURISDICTION AND VENUE ...................................................................................... 6

THE PARTIES................................................................................................................. 7

THE ROLE OF SPORTS NETWORKS AND HOW THEY OPERATE ....................... 8

SPORTS PROGAMMING IN THE DENVER DMA ..................................................... 10

COMCAST'S STRATEGY TO INCREASE ITS DOMINANCE ................................... 12

PROFESSIONAL HOCKEY IN THE DENVER DMA .................................................. 15

RELEVANT MARKETS ................................................................................................ 16

COMCAST'S PROFITABLE PRIOR COURSE OF DEALING WITH ALTITUDE ............... 19

    A.   Altitude's Launch......................................................................................... 19

    B.   Negotiation and Execution of Altitude's Original Affiliation Agreement with
        Comcast........................................................................................................ 20

    C.   The Renewal of the Affiliation Agreement for a Five-Year Term ................ 21

COMCAST HAS REVERSED ITS COURSE OF DEALING WITH ALTITUDE WITH
THE GOAL OF PUSHING ALTITUDE OUT OF THE MARKET. ......................................... 22

    A.   Comcast Is Seeking To Drive Altitude Out of the Market............................ 22

    B.   Comcast Knows its Proposals Are Not Economically Sustainable for Altitude. ........... 24

ALTITUDE GOES DARK. ............................................................................................. 26

COMCAST HAS USED ITS MONOPSONY POWER AS A WHOLESALE PURCHASER
OF REGIONAL SPORTS PROGRAMMING TO ACQUIRE RSNS........................................ 27

COMCAST HAS BEEN ABLE TO MAINTAIN ITS MONOPSONY POWER IN THE
REGIONAL SPORTS PROGRAMMING MARKET DUE TO THE HIGH BARRIERS TO
ENTRY FOR OTHER BUYERS AND LACK OF ALTERNATIVES FOR SELLERS. ........... 28

    A.   High Barriers to Entry Ensure Comcast's Position in the Market Remains
        Entrenched. .................................................................................................. 28

    B.   Altitude and Other Sellers Do Not Have Reasonable Alternatives for Selling to
        Comcast........................................................................................................ 29

THE REASONS COMCAST HAS PROVIDED FOR DRAMATICALLY DEPARTING
FROM ITS PAST COURSE OF DEALING WITH ALTITUDE ARE PRETEXTUAL. ........... 31

    A.   Marketplace Trends Demonstrate that It Is Not Economically Rational for Comcast
        to Discontinue Providing Distribution of Altitude........................................ 31

B.    Local Sports Programming and RSNs Like Altitude Drive Subscribers to Stay with Cable and Not "Cut the Cord." ............................................................................ 31

C.    Comcast Is Passing on the Cost of Carrying Altitude to its Subscribers and Is Even Making Money on Carrying Altitude in Some Cases. ........................................ 32

COMCAST'S ANTICOMPETITIVE CONDUCT HAS HARMED ALTITUDE AND CONSUMERS. ............................................................................................................... 34

CLAIMS FOR RELIEF ....................................................................................................... 35

COUNT ONE: Monopolization in Violation of the Sherman Act, Section 2 ........................ 35

COUNT TWO: Attempted Monopolization in Violation of the Sherman Act, Section 2 ...... 36

COUNT THREE: Monopolization in Violation of the Colorado Antitrust Act ..................... 37

COUNT FOUR: Attempted Monopolization in Violation of the Colorado Antitrust Act ..... 38

COUNT FIVE: Tortious Interference with Contractual Relations ......................................... 40

COUNT SIX: Tortious Interference with Prospective Business Relations ............................ 40

REQUEST FOR RELIEF ..................................................................................................... 41

1.      Plaintiff Altitude Sports & Entertainment, LLC ("Altitude"), by and through its undersigned counsel, brings this action for trebled compensatory damages, punitive damages, and injunctive relief under the antitrust laws of the United States, and for compensatory and punitive damages and injunctive relief under state law, against Defendants Comcast Corporation and Comcast Cable Communications, LLC (together "Comcast"), demanding a trial by jury.  For its Complaint against Defendants, Plaintiff alleges the following:

**NATURE OF THE CASE**

2.      Defendant Comcast is the largest multichannel video programming distributor ("MVPD") in the United States.  Comcast is also the dominant cable television provider in the Denver DMA (Designated Market Area).[1]  The Denver DMA covers 70 counties in three states: Colorado (48 counties), Nebraska (15 counties), and Wyoming (7 counties).  In the Denver DMA, 92% of cable customers have their cable service from Comcast—and the great majority of those customers have *no choice* at all in cable provider; only Comcast cable reaches their neighborhood.  Of all MVPD providers in the Denver DMA, Comcast has the largest market share, approximately 57%, with the next largest MVPD provider, DIRECTV, holding a market share of approximately 25%, less than half of Comcast's market share.

3.      In addition to providing cable television to its subscribers, Comcast, through its subsidiaries, also contracts with sports teams, leagues, conferences, and other entities to obtain the rights to produce and telecast sports programming.  Comcast then distributes that programming to its own subscribers and to other MVPDs such as, for example, DIRECTV.

---

[1] According to Nielsen Holdings PLC, "DMA (Designated Market Area) regions are the geographic areas in the United States in which local television viewing is measured by Nielsen. A DMA region is a group of counties that form an exclusive geographic area in which the home market television stations hold a dominance of total hours viewed.  There are 210 DMA regions, covering the entire continental United States, Hawaii, and parts of Alaska."

4.      Comcast currently owns and distributes regional and national sports programming through its subsidiaries, including the NBC Sports Network, in geographic areas around the country.

5.      Altitude produces and telecasts regional sports programming from its headquarters in Denver.  Altitude's business is known as a Regional Sports Network ("RSN"), and its programming is available throughout the ten state Rocky Mountain region that includes Colorado (the "Altitude Territory").  As an RSN, Altitude invests in licensing the rights to telecast games of regional professional sports teams—such as the National Hockey League's Colorado Avalanche, the National Basketball Association's Denver Nuggets, the National Lacrosse League's Colorado Mammoth, and Major League Soccer's Colorado Rapids.  Altitude also telecasts local and regional college and high school games, as well as other sports-related content, such as talk shows and sports commentary.  Though Altitude's content is primarily focused on sports, it also telecasts other relevant, entertainment-related content, including NASCAR features, poker games, outdoor adventure shows, horseracing, performances by local and regional musicians, and more.

6.      The "regional" aspect of an RSN satisfies consumer demand for, and interest in, local and regional athletics, and enhances the quality of programming by focusing on the consumers' home teams.  By telecasting local and regional professional, college, and high school sports, Altitude contributes to the Denver community.

7.      Altitude is also an independent RSN.  Altitude is not a subsidiary or affiliate of a television distribution company (such as Time Warner/AT&T), nor is it owned or operated by one.

8.      Comcast has carried the Altitude network for the past 15 years, until August 31,

2019, when Comcast blacked out the network after Altitude refused to concede to Comcast's predatory demands. Prior to this, for its entire existence, Altitude has enjoyed stable contractual relations with Comcast. Those relations are critical because Comcast's cable systems and MVPD market share in the Denver DMA make it a monopsonist—that is, a purchaser with market power—over regional sports programming in the Denver DMA. Altitude both competes with Comcast to obtain and license telecast rights for sports programming, and is a direct seller of the programming it produces pursuant to those licenses.

9.    During the same fifteen years of the relationship between Comcast and Altitude, Comcast has acquired independent RSNs all over the country in order to reduce competition for the licensing of sports programming. Comcast has also engaged in a series of large mergers and acquisitions that strengthen its control over multichannel television distribution in the Denver DMA and around the country.

10.    Comcast now wants to extinguish competition from Altitude so that Comcast can pocket more of the money it takes from consumers each month for sports programming in the Denver DMA. In addition to charging its subscribers a monthly fee for the package of programming services that includes Altitude, Comcast also charges those customers an additional fee that Comcast calls a "Regional Sports Fee," which is found as a line-item on each customer's monthly bill. Comcast wants to own and centralize regional sports broadcasting in the Denver DMA—at the expense of quality and choice for consumers—so that it can keep its Regional Sports Fee without having to offer consumers programming from an independent RSN like Altitude.

11.    If Comcast is successful in its campaign against Altitude, Comcast will quickly and easily take over regional sports production in the Denver DMA. In economic and legal

3

terms, that means that Comcast is a "rapid entrant" and is therefore considered a direct competitor to Altitude for antitrust purposes.

12.     Against this backdrop, in the past year, Comcast began making demands in negotiations with Altitude that Comcast knew made no economic sense and would drive Altitude out of business.  The demands represent dramatic cuts in rates to be paid to Altitude. Comcast's proposals would also require subscribers that want to receive Altitude's programming to pay even more to Comcast each month by moving Altitude from one of Comcast's more widely distributed packages of channels to a package of television programming services for which the customer would have to pay an additional fee.  The latter practice—cutting mainstream consumer access to a channel—is known as reducing carriage by moving a channel to a package of programming services that has fewer subscribers and less distribution.

13.     Comcast has not made demands of or imposed drastic rate cuts or carriage reductions on its own affiliated RSNs throughout the country.  For RSNs that it owns, Comcast continues to charge MVPDs per subscriber license fees (*i.e.*, "rates"), and sign new contracts for rates, equal to or higher than what it previously paid to Altitude.  Comcast has saved its demands of drastic rate cuts and carriage reductions, along with a blackout, for Altitude, an independent RSN.

14.     There can be no doubt that Comcast knows the proposals it has made would put Altitude out of business.  Not only has Altitude told Comcast that, but Comcast already knows this because it operates its own RSNs.  Comcast therefore understands that between paying rights fees and production costs, RSNs are expensive businesses to run.  In FCC proceedings, Comcast has even admitted that the same carriage it would deny Altitude is necessary to the

financial viability of an RSN because of the significant cost of acquiring sports telecast rights in agreements that reflect the widespread popularity and value of this programming.

15.     The terms proposed by Comcast to Altitude make no economic sense unless Comcast's aim is to use its monopsony power to eliminate Altitude so that Comcast will control sports programming—both regional and even some national coverage—in the Denver DMA, just as Comcast has done elsewhere.  As the only cable provider for the vast majority of consumers in the Denver DMA, Comcast is able to use its power as a local cable monopoly to control consumers and use them to achieve its ends.

16.     Comcast's near-term goal is to eliminate Altitude as a viable RSN or even purchase Altitude at a dramatically discounted rate.  Comcast's ultimate goal is to do to Altitude what Comcast has already done around the country:  reduce or eliminate competition from independent RSNs as part of Comcast's strategy to control television from top (consumers' television service) to bottom (the production of sports programming).

17.     This conduct amounts to Comcast's maintenance of its monopsony power and monopolization and attempted monopolization in violation of the federal Sherman Antitrust Act and Colorado Antitrust Act.  Comcast's conduct also constitutes tortious interference with Altitude's actual contractual and prospective relations with its affiliated sports teams and advertisers.

18.     Comcast's anticompetitive conduct harms consumers and competitors. Comcast is already reaping the benefits of its anticompetitive conduct, and one of the key consequences is evident on monthly bills that Comcast sends to its cable subscriber customers: the "Regional Sports Fee" that Comcast charges its subscribers is more than twice the amount that Comcast was paying every month to Altitude for each subscriber.  But Comcast has paid

nothing to Altitude since August, yet the fee that consumers pay to Comcast remained unchanged well after Comcast stopped paying Altitude and stopped providing Altitude programming to its customers.  Only recently has Comcast begun issuing small monthly credits to its subscribers for an amount far below the monthly fee Comcast has avoided paying Altitude during the time Comcast has blacked out Altitude programming.

19.     By this conduct, Comcast has demonstrated that it will not pass along any savings it obtains from eliminating Altitude.  Instead, Comcast will use its market power to keep consumer prices high.  At the same time, by not carrying Altitude, Comcast will reduce the quality of regional sports programming available to consumers in the Denver DMA.

## JURISDICTION AND VENUE

20.     Plaintiff brings this action to recover damages, including treble damages, costs of this suit, and reasonable attorney's fees, as well as injunctive relief, arising from Defendants' violation of  Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, and the Colorado Antitrust Act, Colo. Rev. Stat. § 6-4-105.

21.     This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to  28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation).

22.     This Court has subject matter jurisdiction over Plaintiff's pendent state law claims  pursuant to 28 U.S.C. § 1367.  Each of Plaintiff's state law claims arises out of the same factual  nucleus as Plaintiff's federal antitrust claims.

23.     Venue is proper in this district pursuant to 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391.  Plaintiff resides in this district, and Defendants transact business and are otherwise found in this district.  Further, the events giving rise to these claims occurred in this

district, and Defendants are subject to personal jurisdiction before this Court.  Fed. R. Civ. P. 4;

Colo. Rev. Stat. § 13-1-124.

## THE PARTIES

24.     Plaintiff Altitude Sports & Entertainment, LLC, f/k/a KSE Media Ventures, LLC,

("Altitude") is a limited liability company organized and existing under the laws of Colorado

with its principal place of business at 1000 Chopper Circle, Denver, Colorado 80204.  Altitude is

a regional sports network that holds the telecast rights for professional sports teams Denver

Nuggets (National Basketball Association), Colorado Avalanche (National Hockey League),

Colorado Mammoth (National Lacrosse League), and Colorado Rapids (Major League Soccer),

and telecasts those teams' games on its regional sports network.  Altitude also telecasts a range

of other regional and local sports programming, including, without limitation, University of

Denver sports and local high school sports.

25.     Defendant Comcast Corporation is incorporated in the state of Pennsylvania with

its principal place of business at One Comcast Center, 1701 John F. Kennedy Blvd.,

Philadelphia, Pennsylvania 19103.  Comcast Corporation, itself and acting through its

subsidiaries and its affiliates, provides "Comcast"- and "Xfinity"-branded services, including

multichannel video programming distribution ("MVPD").

26.     Defendant Comcast Cable Communications, LLC (together with Comcast Corp.,

"Comcast") is a limited liability company organized and existing under the laws of Delaware

with its principal place of business at One Comcast Center, 1701 John F. Kennedy Blvd.,

Philadelphia, Pennsylvania 19103.  Comcast Cable Communications, LLC is a subsidiary of

Comcast Corporation and is responsible for providing cable television, broadband internet, and

landline telephone services under the Xfinity brand.  Comcast is the largest MVPD/cable

operator in the nation.

**THE ROLE OF SPORTS NETWORKS AND HOW THEY OPERATE**

27.     RSNs telecast sports programming to and from a specific geographic region.  To obtain the sports programming, RSNs enter into licensing agreements with professional, collegiate, and high school sports teams, leagues, and conferences.  Since games between professional sports teams draw substantial audiences, the right to telecast these games has become the most attractive—and most expensive—sports programming.

28.     Professional sports teams charge a high fee, generally on an annual basis, for such licensing rights (the "rights fee").  On occasion, the professional league to which the sports team belongs performs a market analysis.  In addition, various analysts and experts may perform similar services for the sports team.  The sports team then negotiates the rights fee based on the market analysis and its historic fees and relationships with RSNs.  Teams' fees tend to vary based on a number of factors, including historic team popularity, relevant market size, geographic reach, team success, and competition for the teams' telecast rights.

29.     Once an RSN pays the rights fee, it gains the right to telecast the team's games in that region (the "licensing agreement").

30.     The rights fees for NBA, NHL, and MLB games are an RSN's largest expense; however, RSNs also must spend significant sums to produce the high quality television coverage of those games demanded by the RSN's MVPD customers.  To offset these costs, RSNs have two primary sources of revenue:  per subscriber fees and advertising.  Comcast's exclusionary and unlawful conduct extends into both of these areas.

31.     MVPDs contract with RSNs to purchase sports programming that they will distribute on their cable and other systems to end-users on a regional basis (the "affiliation agreement").  In every instance, in order to maximize its two primary sources of revenue, RSN

8

affiliation agreements require MVPDs to carry the RSN in one of the MVPD's most widely-distributed packages of channels (the "carriage requirements").

32.     The MVPD pays the RSN a monthly per subscriber fee for each household that receives the RSN programming.  This fee varies depending on how close the subscriber is to the core market (*i.e.*, the closer the subscriber is to the home venues of the teams, the higher the per subscriber fee).

33.     As a result of the industry concentration, MVPDs already charge consumers monopoly prices (that is, they take a "monopoly rent" from consumers), and will not meaningfully lower consumer prices if their own costs go down.  Comcast's refusal to stop charging the Regional Sports Fee demonstrates this.  The fees Comcast pays for regional sports programming in the Denver DMA dropped dramatically, but Comcast offered only a token bill reduction (as a public relations move after consumer outcry).  Thus, disputes about RSN fees are not about how much consumers will pay Comcast.  They are about what programming consumers can access and about how much money Comcast will pocket for itself each month.

34.     To maximize its advertising revenue, each RSN seeks distribution by the MVPD on one of its most widely distributed levels or packages of service.  For example, with an "expanded basic" package, among the most widely distributed packages a consumer could purchase from an MVPD, an RSN would most likely reach between 70% to 85% of the MVPD's subscribers in the applicable market.  The broad audience that can be reached on an expanded basic package leads to a broad range of advertising opportunities and revenues.

35.     If an RSN is moved to a less widely distributed package (*e.g.*, one that requires an additional fee from the customer and contains less popular services, like a "sports tier"), the RSN's market penetration for such a package would be about 15% to 20%, or even less

depending on the services included in the package.  This drop in penetration dramatically shrinks the RSN's per subscriber fees.

36.     That drop in penetration also dramatically shrinks the audience for advertising. Moving an RSN to a tier with lower penetration means losing many advertising opportunities and revenue currently available to it on basic and expanded basic packages.

37.     National sports networks owned or operated by MVPDs ("MVPD National Sports Networks") operate in much the same way.  They too enter into licensing agreements to telecast sports content.  MVPD National Sports Networks telecast nationally and not regionally.  Instead of telecasting all of a single team's games, MVPD National Sports Networks generally telecast a set number of the league's games a week with varying and rotating teams.  Like RSNs, MVPD National Sports Networks rely on advertising and subscriber revenue to cover their costs.  In addition, RSNs may be owned partially or completely by an MVPD (each, an "MVPD Affiliated RSN"), and MVPD Affiliated RSNs operate identically to the way independent RSNs, like Altitude, operate.

**SPORTS PROGAMMING IN THE DENVER DMA**

38.     Altitude has obtained the exclusive regional rights to telecast the vast majority of games for the National Hockey League's Colorado Avalanche, the National Basketball Association's Denver Nuggets, the National Lacrosse League's Colorado Mammoth, and Major League Soccer's Colorado Rapids, with national networks paying the applicable professional sports league for the right to telecast nationally only a few of each team's games.

39.     In 2006, Comcast teamed with the Mountain West Conference of the National Collegiate Athletic Association to form the MountainWest Sports Network (informally known as

"The Mountain").  The Mountain televised many of the conference's sporting events, including college football, basketball, and hockey.

40.     Comcast operated The Mountain out of its Comcast Media Center in Centennial, Colorado, which is located in the Denver metropolitan area.  This Center is less than six miles from Altitude's network operations center and is the largest television and film studio in Colorado.

41.     In 2012, The Mountain stopped operating due, in part, to the Mountain West Conference's ongoing conference realignment.  Since then, AT&T SportsNet Rocky Mountain, a Denver RSN owned by AT&T, has telecast many of the Mountain West Conference's games.  Comcast maintains its studio, now rebranded as WestWorks, which recently announced it would focus on Comcast-specific programming.

42.     By 2011, Comcast had acquired a majority stake in NBCUniversal and its sports programming subsidiary, NBC Sports Group.  That same year, Comcast used NBC Sports Group to secure the right to nationally broadcast over one hundred regular-season NHL games, as well as over eighty Stanley Cup matchups.  Comcast finalized its acquisition of NBCUniversal in 2013, and now broadcasts the NHL games through its subsidiary, NBC Sports Group (comprised of NBC Sports Network and NBC Sports).  Comcast also has minority rights to the NHL Network, the other cable and satellite network with national rights to NHL games.

43.     NBC Sports Group also airs primetime National Football League games every week.

44.     NBC Sports Group also operates eight RSNs, making it the largest owner of MVPD Affiliated RSNs.

45.     Comcast continues to expand NBC Sports Group's presence in sports programming with license agreements for professional sports teams, college football, and international soccer.

46.     Though Comcast does not currently own or operate an RSN in the Denver DMA, its current MVPD Affiliated RSN infrastructure, in addition to the remaining infrastructure from The Mountain coupled with its national sports programming presence, means Comcast could enter the RSN market in the Denver area quickly.  Comcast is what the Department of Justice Horizontal Merger Guidelines calls a "rapid entrant" that is considered a direct competitor with Altitude for purposes of antitrust analysis.

**COMCAST'S STRATEGY TO INCREASE ITS DOMINANCE**

47.     Comcast's ability to rapidly enter as an RSN in the Denver DMA—as well as its market power and strategy—are also demonstrated by Comcast's successful execution of a long-term strategy to consolidate its power throughout the chain of production and distribution over the past twenty years.  A critical part of Comcast's consolidation strategy is acquiring RSNs.

48.     Comcast's mergers and acquisitions over the past twenty years include:

    a.  2001: Comcast acquired AT&T Broadband and became the largest cable television company in the United States.

    b.  2005:  Comcast continued to accumulate market power by purchasing Susquehanna Communications.

    c.  2005:  Comcast teamed with Time Warner Cable to purchase the assets of another competitor, Adelphia Cable.

    d.  2011: Comcast began purchasing shares in NBCUniversal and had complete ownership of all of NBCUniversal and its subsidiaries by 2013.

49.     Notwithstanding the existence of various FCC rules, the FCC previously has found it necessary to impose additional transaction-related safeguards as conditions for approving vertical transactions between Comcast and video programming networks.

50.     The FCC has expressed concern over Comcast's ability to strong-arm independent RSNs.  When Comcast purchased assets from Adelphia, the FCC issued an order requiring Comcast to engage in arbitration over carriage disputes with unaffiliated RSNs.  Although the FCC's order has expired, the competitive concerns that the FCC identified in connection with the Adelphia transaction persist.

51.     After Comcast sought to purchase Timer Warner Cable, the FCC expressed its concerns over not just the consolidation of video subscribers, but also a consolidation of those subscribers alongside the ownership of significant programming interests as harmful to consumers.

52.     When Comcast purchased NBCUniversal, both the FCC and the DOJ imposed restrictions on Comcast, in the latter case via a consent decree, to protect against the anticompetitive effects of its increasing monopsony power in the Programming Market, among others.

53.     Comcast has engaged in anticompetitive behavior with regards to its national sports programming.  In 2008, the Big Ten Network reported that Comcast would not resolve a deal for the network's programming because Comcast did not own at least part of the new network, and it was treating the new network differently than Comcast's own sports networks, NBC SportsNet and the Golf Channel, which have limited audiences and low ratings.  That same year, the NFL's former commissioner recounted that when the NFL decided to sell certain games to its own network, instead of Comcast, Comcast's chief executive, Brian Roberts told the

league: "Your relationships with the cable industry are going to get very interesting."  As an act of retaliation, Comcast then moved the NFL network to its digital sports tier.

54.     As a result of its growth, Comcast is incentivized to further maximize its consolidated ownership by taking over the entire chain of regional sports programming production, and distribution.  As one market commenter has noted:  "The cable companies don't want sports teams to own their own channels.  They want everything under one nice big corporate umbrella.  This is why they are playing such hardball with Altitude."  Adrian Dater, Colorado Hockey Now (Sept. 1, 2019). *Altitude goes dark in Denver*, https://coloradohockeynow.com/2019/09/01/altitude-goes-dark-for-in-denver/.

55.     Comcast even offers sports teams equity interests in Comcast's affiliated RSNs to prevent them from launching competing independent RSNs.  And Comcast has given teams like the Boston Celtics, Washington Wizards, Washington Capitals, San Francisco Giants, Chicago Bulls, Chicago Blackhawks, and Chicago White Sox equity interests in its affiliated RSNs.

56.     Over the past two decades, Comcast has launched or acquired eleven RSNs, and in recent years, has attempted to quadruple its holdings.  Currently, NBC Sports Group, the NBC subsidiary that owns Comcast's sports programming, holds eight RSNs, making Comcast the largest owner of MVPD Affiliated RSNs.

57.     Comcast's ideal situation was accomplished in Northern California.  There, Comcast owns two regional sports networks that together hold all television rights for MLB, NBA, and NHL teams in the area.  The same pattern followed in the Philadelphia area, and in Chicago, Comcast has an ownership interest in the RSN with nearly all rights to the area's professional sports teams.

58.     Comcast has ownership interests in RSNs located throughout the country, spanning both coasts and the Midwest.  Comcast's current RSNs, listed in order of launch or acquisition date are:  NBC Sports Philadelphia (launched in 1997), NBC Sports Washington (launched in 2001), NBC Sports Chicago (launched in 2003), NBC Sports California (launched in 2004), SportsNet New York (launched in 2006), NBC Sports Boston (acquired in 2007), NBC Sports Bay Area (acquired in 2007), and NBC Sports Northwest (launched in 2007).  Comcast's RSNs range in size from 1.8 million to 6.6 million subscribers.

59.     In 2014, Comcast attempted to further increase its RSN holdings through an acquisition of Time Warner Cable.  Had Comcast been successful, it would have acquired rights to three regional sports networks in the Los Angeles area:  the Dodgers Channel, TWC SportsNet, and TWC Deportes.  Further Comcast would have increased its ownership interest in SportsNet New York.  However, Comcast abandoned the merger after the FCC imposed significant time delays on the deal, signaling that Comcast would not be able to obtain the necessary regulatory approval.

60.     Last year, Comcast made an offer to acquire 22 additional RSNs in licensing markets across the country by engaging in a bidding war to purchase the assets of 21st Century Fox.  Comcast offered $65 billion for the assets, which included the RSNs for over three dozen MLB, NBA, and NHL franchises.  Disney would later beat Comcast in the bidding war and, pursuant to a consent decree, divested the 22 RSNs to Sinclair Broadcast Group.

## PROFESSIONAL HOCKEY IN THE DENVER DMA

61.     Comcast's dominance and its strategy of vertically integrating so that it controls all aspects of sports television—from the service in consumers' living-rooms to the production of sports programming—is already on display in the Denver DMA's market for professional hockey programming.

62.     Comcast controls national NHL telecasts through its subsidiary, NBC Sports Network ("NBCSN").  For the first two months of the NHL season, NBCSN is the primary network that broadcasts NHL games nationally.  After the first two months, the NHL also nationally broadcasts games on local NBC affiliates, which are also owned by Comcast.  For the 2019-20 NHL season, NBCSN has the rights to televise nearly 100 NHL regular-season games, including the Opening Night doubleheader, 38 "Wednesday Night Hockey" games, and 22 doubleheaders.  In addition, NBCSN has indicated that it has left the majority of the final week of the regular season open on its schedule to allow it to televise the games with the biggest impact on the playoffs.

63.     For this NHL season, NBCSN has decided to broadcast the maximum number of Avalanche games allowed by the National Hockey League for national distribution.

64.     Consumers can also watch NHL games through the NHL-owned product NHL TV, which makes access to games available to fans to purchase through an All Access Pass sold by the NHL.  Comcast is a partial owner in the NHL Network, which owns and operates NHL TV, and therefore has partial ownership and control, and a share in the profits, of the NHL TV product.

65.     The only remaining way consumers in the Denver DMA can watch telecasts of NHL games is on an RSN.  Altitude is the only RSN in the Denver DMA that telecasts NHL games.

66.     Comcast wants to maintain its control over hockey programming, and to increase its control in every other professional sport.

**RELEVANT MARKETS**

67.     Consumers demand extensive coverage of local and regional teams, as well as coverage of significant national sporting events.  As a result, there are both national and regional

16

geographic markets for televised sports programming.  The regional markets are relevant antitrust markets, but they can also be viewed as well-defined "submarkets" within the larger market for all sports programming.

68.     The relevant geographic market is the Denver DMA.

69.     Comcast is the dominant MVPD in the Denver DMA, and the only choice for cable for most of Denver and its surrounding communities.  Comcast has the infrastructure to reach more customers than any other cable providers in the Denver DMA.

70.     Comcast's position in the MVPD market is protected by high barriers to entry and switching costs.  Consumers are often forced to the choose the MVPD with existing infrastructure, instead of spending time and money to install the additional infrastructure needed to use another MVPD's services, such as direct broadcast satellite.  Comcast's existing infrastructure has helped it to accrue the largest subscriber base of any cable provider or MVPD in the Denver DMA with an estimated 92% market share among cable television providers and a market share of approximately 57% among all MVPD providers, including cable and broadband satellite.

71.     The vast majority of consumers have a single MVPD—a single television service provider—and in and around Denver that provider is Comcast.

72.     MVPDs control access to consumers' television screens, making them critical "gatekeepers" to the ultimate consumers of sports programming—television viewers and sports fans in the Denver DMA.  In other words, MVPDs are distributors who sell sports programming to consumers as part of their television packages.

73.     The FCC treats RSNs as a separate category of programming for purposes of market definition.  The FCC has characterized RSN programming as programming for which no reasonable available substitute exists.

74.     In economic terms, the MVPDs, including cable companies, purchase programming, including from RSNs, in a "wholesale" market, then re-sell it to consumers in a "retail market" by charging their subscribers monthly fees, acting as middlemen between RSNs and consumers.

75.     The relevant antitrust product markets in this case are for the production of regional sports programming (hereafter "the Regional Sports Production Market"), and the sale of regional sports programming ("the Regional Sports Programming Market").

76.     Relevant antitrust product markets in this case also include the production of professional hockey programming (hereafter, "the Professional Hockey Production Market") and the sale of professional hockey sports programming ("the Professional Hockey Programming Market").

77.     The Regional Sports Programming Market contains alternative or relevant antitrust "submarkets," including the market for Professional Hockey Programming.  Comcast's anticompetitive conduct has already made Comcast the sole source for viewing the vast majority of regular-season live hockey games in the Denver DMA.

78.     In the Denver DMA, Comcast is a monopsonist in the Regional Sports Programming Market.  To stay in business, RSNs must sell to Comcast in the Regional Sports Programming Market.

79.     "Monopsony" is the technical term for a purchaser with monopoly power. Monopsonists are subject to the antitrust law of monopolization just as other monopolists.

80.     Altitude and independent RSNs compete directly with Comcast in the Regional Sports Production Market even as they simultaneously sell the programming they produce to Comcast in the Regional Sports Programming Market.

81.     Comcast has a reasonable probability of successfully monopolizing the Regional Sports Production market in the Denver DMA by driving Altitude out of business because of Comcast's dominant position in distribution, its deep pockets, its experience operating RSNs, and its ability to quickly produce Denver DMA regional sports programming using Comcast's existing facilities—including facilities in Denver.

82.     Comcast's dominance in the market for Professional Hockey Programming in the Denver DMA also establishes that Comcast is already successfully monopolizing a market, and shows the ease with which Comcast will monopolize the larger Regional Sports Production Market (including the Professional Hockey Production Market).

## COMCAST'S PROFITABLE PRIOR COURSE OF DEALING WITH ALTITUDE

### A.  Altitude's Launch

83.     Altitude launched its RSN on September 4, 2004.  With the telecast rights for the Denver Nuggets, Colorado Avalanche, Colorado Mammoth, and Colorado Rapids, Altitude provided at the time of its launch, and continues to provide, the most comprehensive RSN for local sports fans in the Rocky Mountain Region.

84.     Until August 31, 2019, Comcast was party to an Affiliation Agreement with Plaintiff under which, in consideration of the payment by Comcast to Altitude of a monthly per subscriber license fee, and a commitment to carry Altitude's RSN in a widely distributed package of programming services on Comcast's cable systems, Altitude granted Comcast a license to telecast Altitude's RSN programming on Comcast's cable systems within the Denver DMA and elsewhere within the Altitude Territory.

19

85.     Immediately prior to Comcast's decision to no longer carry Altitude, Altitude had 2.4 million MVPD subscriber homes within the ten-state Altitude Territory.   The Denver DMA is at the core of Altitude's Territory and is the most concentrated area of Altitude viewers. Altitude provides a broad array of sports programming, including basketball, hockey, soccer, lacrosse, baseball, boxing, and cycling.

86.     Altitude provides content at every level of athletics, from high school to college to professional.  Its programming includes games from local area high schools and the University of Denver.

87.     Altitude's total ratings have experienced significant growth in recent years.  The network's overall ratings increased 70% from the 2016-2017 season to the 2017-2018 season and increased 63% from the 2017-2018 season to the 2018-2019 season.

88.     Over recent seasons, the household ratings for the teams Altitude carries have likewise increased.  Between the 2017-2018 and 2018-2019 NBA seasons, for example, the Nuggets' household ratings increased by approximately 74%, even though the NBA at large saw a 4% decline in viewership.

89.     In the 2018-2019 season, Comcast accounted for the highest share of households viewing Altitude in the Denver DMA.

### B.  Negotiation and Execution of Altitude's Original Affiliation Agreement with Comcast

90.     Prior to its launch in September, 2004, Altitude reached out to Comcast to negotiate an affiliation agreement under which Altitude would grant Comcast a license to distribute Altitude's content to Comcast subscribers in the Denver DMA and elsewhere in Altitude's Territory.

91.     Comcast initially rejected Altitude's proposal, expressing skepticism that Altitude would be successful.  Comcast informed Altitude that it was more interested in directly purchasing the rights Altitude held so Comcast could directly control the programming.

92.     Despite this initial reluctance, Comcast eventually agreed to an initial Affiliation Agreement with Altitude for a term of ten years.

93.     Comcast's initial Affiliation Agreement with Altitude contained a minimum penetration provision requiring Comcast to carry Altitude on a cable package reaching at least 70% of its subscribers.  In addition, the initial Affiliation Agreement set a schedule of monthly fees that ranged across six zones and increased annually at a rate of 5%.

### C.  The Renewal of the Affiliation Agreement for a Five-Year Term

94.     Comcast's initial Affiliation Agreement was set to expire at the end of August, 2014.  Upon expiration, Comcast elected to renew the Affiliation Agreement for another five years.

95.     As part of the new five-year term, Altitude negotiated updated terms and rates with Comcast.  The updated terms were materially similar to the previous contracts, with the main difference being increased rates to reflect the passage of time and bring the rates up to what Altitude saw as market rate.

96.     Comcast's new agreement was set to expire August 31, 2019.

97.     When Comcast negotiated the extension of the initial ten-year term for an additional five years, negotiations were completed in advance of the end of the ten-year term such that there was no interruption in service for Altitude fans.

98.     Under these new terms, Comcast continued to telecast Altitude's programming uninterrupted for another five years.

## COMCAST HAS REVERSED ITS COURSE OF DEALING WITH ALTITUDE WITH THE GOAL OF PUSHING ALTITUDE OUT OF THE MARKET.

### A.   Comcast Is Seeking To Drive Altitude Out of the Market.

99.     Despite its successful fifteen-year course of dealing, Comcast abruptly reversed course late last year and is now demanding that Altitude accept rates significantly less than what Comcast has historically paid Altitude, and Comcast is insisting on carriage of Altitude in a package of services having approximately 15% penetration (rather than the 70% minimum penetration it had agreed upon for the prior 15 years).

100.    Comcast is abusing its monopsony power to drive Altitude out as a competitor, as evidenced by its conduct over the past year.

101.    In October, 2018—just under a year before its agreement with Comcast was set to expire—Altitude offered Comcast a proposed two-year extension to its current contract, on the current terms, which would have extended the contract term to August, 2021.

102.    Without any discussion or meeting, Comcast declined to accept this offer of an extension.

103.    Altitude next proposed a five-year contract renewal in February, 2019.  Altitude offered Comcast rates similar to those under its current contract, with an industry-standard annual increase over the five years.

104.    Comcast failed to respond to this offer, despite follow-up from Altitude, for four months.

105.    When Comcast did finally respond to Altitude's proposal in June, 2019, it was with a draconian counter-proposal for rates and carriage that were entirely unreasonable and unworkable for Altitude given the costs it pays to rights holders and its production costs.

106.    In its counter-proposal, Comcast proposed to eliminate the minimum penetration requirement present in all its previous contracts and change the monthly per subscriber fee to a flat base fee and annual increase, resulting in a fraction of what Comcast had paid Altitude under its previous contracts.  Comcast also proposed only a three-year term.

107.    This proposal would have put Altitude out of business, had Altitude accepted. Altitude declined the offer.

108.    Altitude has continued to try to negotiate with Comcast in good faith, but to no avail.  Comcast has stated that it will only enter a contract with Altitude on Comcast's terms. Comcast has made it clear throughout negotiations that it is not willing to negotiate terms similar to those it has operated under with Altitude for the past fifteen years.

109.    Altitude also explained to Comcast why its counter-proposals were not workable for Altitude and reminded Comcast that their own MVPD Affiliated RSNs would not survive were they forced to accept such terms.  Comcast ignored these points.

110.    Comcast has even rebuffed Altitude's attempts to reach a short-term solution while negotiations continue.  In August, 2019, with the contract expiration fast approaching, Altitude offered Comcast a one-year extension of its existing contract with the exact same rates and terms in order to give the parties more time to negotiate a long-term solution and avoid a situation in which Altitude was blacked out by Comcast.

111.    Comcast rejected this offer, indicating it would rather black out Altitude than consider a short-term solution to continue negotiations.

112.    Notwithstanding Altitude's repeated, good faith efforts to negotiate, Comcast has refused to negotiate on reasonable terms and has offered only counter-proposals it knows are economically unsustainable for Altitude or any RSN.

113. Comcast has made evident through its negotiations, and offers of economically unsustainable terms, that it does not have any interest in continuing to contract with Altitude. Rather, it seeks to eliminate Altitude.

### B. Comcast Knows its Proposals Are Not Economically Sustainable for Altitude.

114. Comcast knows its proposals to Altitude are not economically sustainable for Altitude or any RSN.

115. Because Comcast owns its own sports networks, it knows that between paying rights fees and game production costs, RSNs are expensive businesses to run. Comcast also knows that what it has offered to Altitude, if offered to its own RSNs, would put those RSNs out of business, assuming they were not being cross-subsidized by other Comcast businesses.

116. NBCUniversal Media, LLC, which is owned by Comcast and negotiates carriage deals on behalf of Comcast's RSNs, emphasized that guaranteed levels of carriage are vitally important to an RSN's survival, particularly its ability to attract advertising revenue, in a recent submission to the Federal Communications Commission.

117. As E. McRae Budill, the primary negotiator for Comcast's RSNs has explained, "RSN agreements . . . typically require that the RSN be distributed in the distributor's first or second most widely-distributed package of channels or 'tier' and received by a minimum percentage of the distributor's subscribers." As Mr. Budill further explained:

> Such distribution commitments provide reasonable certainty with respect to the minimum amount of subscriber fees an RSN can expect to receive, as well as the subscriber base against which it can expect to sell advertising, and that certainty is a fundamental part of negotiations for the RSN rate over the life of the contract.

Mr. Budill also went on to state:

> These marketplace-based distribution commitments are a key part of the consideration that programmers, including NBCUniversal, negotiate with all

distributors, particularly given the significant costs of acquiring professional sports exhibition rights and associated obligations for these rights.  Professional sports teams license the exclusive right to televise their games to RSNs – typically at a high fixed cost, and on a long-term basis – pursuant to media sports rights agreements that reflect the widespread popularity and value of the programming.  RSNs bear the risk of recovering those high costs; and the sports teams typically include provisions in their media rights agreements that require RSNs to seek broad distribution in packages of channels that reach a wide percentage of subscribers, thereby helping to support and grow the team's base of fans.  Broad distribution of the games also helps the RSN attract more viewers and is essential to the RSN business model, which relies on both affiliate fees and advertising revenue to offset the high fixed costs of the programming.

118.    In order for an RSN to recoup the costs of acquiring sports licensing rights, it is necessary for RSNs to obtain broad distribution, reaching a wide percentage of subscribers.  In its prior agreements with Comcast, Altitude had access to 70% to 85% of subscribers on an "expanded basic" package.  The recent proposals by Comcast would not only reduce the per subscriber fees Altitude would receive, but also drastically reduce the percentage of subscribers it would reach to about 15% to 20%, or even less, by placing Altitude on a sports tier.

119.    Reducing the number of subscribers Altitude reaches has a direct impact on its advertising opportunities and licensing revenues.

120.    As Comcast has recognized and acknowledged in its carriage of its own RSNs, access to at least an expanded basic cable package is necessary to provide an RSN such as Altitude the size audience to generate the fees and advertising opportunities necessary for an RSN to be economically viable.

121.    By no longer providing Altitude with carriage on an "expanded basic" package and reducing its potential market penetration from between 70% to 85% down to 15% to 20%, the offers by Comcast would drastically reduce Altitude's market penetration and thereby substantially reduce its audience for advertising and per subscriber fees.

25

122.    Comcast's offered terms—terms that Comcast's subsidiaries have admitted are not economically viable for an RSN—are further evidence that Comcast is actively trying to eliminate Altitude as a competitor.

123.    Comcast also has not made the same drastic reductions in distribution and subscriber fees for its own affiliated RSNs, nor any other MVPD Affiliated RSNs that it has demanded of Altitude.   By offering Altitude discriminatory terms—not comparable to the terms that Comcast offer its own RSNs—Comcast is knowingly depriving Altitude of the ability to have a sufficient subscriber base for the subscriber fees and advertising revenue necessary to offset the costs of programming.

**ALTITUDE GOES DARK.**

124.    On August 31, 2019 at 11:59:59 PM Mountain Time, the Altitude-Comcast agreement expired without a new or renewed agreement.

125.    Comcast immediately ceased distributing Altitude to all of its subscribers.  As of the filing of this complaint, Altitude remains blacked out and is unavailable to all Comcast subscribers.

126.    While Altitude is carried by other providers, including DIRECTV and smaller providers like Spectrum and CenturyLink, Comcast is by far the largest provider in the Denver DMA, providing cable service to approximately 92% of consumers with cable television (as opposed to satellite) in the Denver DMA.  Of all MVPD providers offering any kind of television service in the Denver DMA, Comcast has a market share of approximately 57%, with DIRECTV holding the next highest market share at approximately 25%, less than half Comcast's share.

127.    For many consumers in the Denver DMA, Comcast is their only option for television, and for others the cost or difficulty of switching providers is prohibitive.  Regardless

of the contracts Altitude has with other providers, Comcast's blackout of Altitude means the vast

majority of consumers in the Denver DMA have no access to Altitude programming.

128.     Comcast subscribers are currently unable to watch any of the games Altitude has

the rights to televise, including those of the Colorado Avalanche and the Denver Nuggets.  The

only games Avalanche and Nuggets fans can watch are the few that will be televised nationally

on ESPN, TNT, ABC, and Comcast-owned NBC or the NBC Sports Network.

129.     Altitude's advertising revenues, and subscriber revenues, were both adversely

impacted when it was blacked out by Comcast.

## COMCAST HAS USED ITS MONOPSONY POWER AS A WHOLESALE PURCHASER OF REGIONAL SPORTS PROGRAMMING TO ACQUIRE RSNS.

130.     Comcast's monopsony power has increased since its first Altitude agreement over

fifteen years ago, as part of an unprecedented wave of MVPD consolidation, expansion, and

vertical integration.

131.     By negotiating fees and carriage that undermine an independent RSN and require

it to charge below its costs, Comcast knows that it can cause any independent RSN to go out of

business.  Comcast may then reacquire the content by either purchasing the RSN's television

rights themselves or by ensuring that the RSN becomes part of some other consolidated

ownership.  Once Comcast reacquires the content, the subscribers return, mitigating any long-

term losses.  For these reasons, Comcast is incentivized to suffer a short-term temporary loss of

subscribers to achieve enormous long-term gains.

132.     Comcast is now using its monopsony power in the wholesale purchase of sports

programming in the Denver DMA to drive Altitude out as a competitor in this exact manner.

133.     After Comcast puts Altitude out of business, Comcast will attempt either to buy

Altitude or set up its own RSN to replace Altitude.  This means that Comcast is not only

violating the antitrust laws' prohibition on acquiring or maintaining monopoly (monopsony)

power as a buyer in the Programming Market (the market where Altitude sells its productions);

Comcast is also illegally attempting to monopolize the Production Market (the market in which

Altitude and other RSNs compete to create programming) by replacing Altitude with Comcast's

own captive RSN.  Comcast's attempt to monopolize the Production Market is a separate and

independent violation of the antitrust laws.

**COMCAST HAS BEEN ABLE TO MAINTAIN ITS MONOPSONY POWER IN THE
REGIONAL SPORTS PROGRAMMING MARKET DUE TO THE HIGH BARRIERS
TO ENTRY FOR OTHER BUYERS AND LACK OF ALTERNATIVES FOR SELLERS.**

### A.  High Barriers to Entry Ensure Comcast's Position in the Market Remains Entrenched.

134.    Comcast's position is entrenched by its cable network, which it built over decades

while it was protected by regulation and when consumers had no choice but to use its local cable

monopoly.

135.    RSNs must either work with MVPDs or enter the distribution market for

professional sports broadcasting themselves.  Entering the distribution market is extremely

difficult because of this industry's high barriers to entry.  MVPDs' value to sports programmers

stems from their ability to reach a large number of customers.  Reaching this many people

requires expensive investments in infrastructure.

136.    Comcast has spent decades building up the infrastructure to support its

monopsony power and owns the physical cables that run throughout the Denver DMA and

provide cable to Denver consumers.  Building up sufficient infrastructure to compete with

Comcast in a short period of time would be impossible for Altitude or other potential market

entrants.

137.     Comcast hopes to starve Altitude of the revenues it needs to survive and then, once Altitude is driven from the market, replace it with its own RSN.  If Comcast succeeds, it will erect yet another barrier to entry.  Because all the RSNs in the Rocky Mountain region would have affiliated MVPDs, it will be impossible for a sports programmer to enter the Regional Sports Programming Market unless they enter both the licensing and distribution markets at the same time.

### B. Altitude and Other Sellers Do Not Have Reasonable Alternatives for Selling to Comcast.

138.     Altitude does not have reasonable alternatives for selling to distributors other than Comcast that would reach distribution levels comparable to its prior contracts with Comcast.

139.     In order to be successful in professional sports, broad-based distribution is required.  Without broad-based distribution, RSNs are not a sustainable business model. Comcast knows this fact from its own ownership of RSNs.

140.     In a posting to fans, Matt Hutchings, Altitude's President, explained why there presently is not a model that supports a streaming/direct to consumer option:

> Unfortunately, today a model does not exist that can support a streaming/direct to consumer option.  Ask yourself why large corporations like NBC/Comcast and AT&T/DIRECTV don't offer their Regional Sports Networks directly to their consumers.  The answer is, all Regional Sports Networks, Altitude included, must be very broadly distributed (i.e., on basic or expanded basic on cable or satellite) in order to have enough revenue to license and pay for the various team and league games they each carry and offer to their customers.  A direct to consumer offering would be very expensive to the consumer and likely would not raise sufficient revenue for Altitude and the other Regional Sports Networks to remain in business.  If this model did not exist, the Regional Sports Networks, including Altitude, would disappear as they would not have sufficient revenue to pay for the rights fees for the wide array of sports programming they provide to their subscribers.  As a result, sports fans would not be able to watch their favorite local teams.
>
> There is not a Regional Sports Network in the country that provides a streaming/direct to consumer option.  In fact, neither Comcast, which owns the

NBC SportsNet Regional Sports Networks in Philadelphia, New York, Boston, Chicago, Los Angeles Bay Area and Portland/Seattle, nor DIRECTV (AT&T), which owns AT&T SportsNet Regional Sports Networks in Colorado (which carries the Rockies), Las Vegas, Salt Lake City, Houston and Pittsburgh, do not offer streaming direct to consumer options to their consumers.[2]

141.    Lee Berke, President and CEO of the New York-based LHB Sports, Entertainment & Media, Inc. consulting firm, co-authored the original business plan for the New York Yankees' YES Network.  In an interview with *The Athletic*, Berke explained why it is not feasible to reach fans by streaming:

> Berke said it's possible that in about 10 or 15 years that over-the-top or OTT distribution could be further developed in allowing networks the freedom to offer that as a viable option. "You still have nationally around 80 million homes that are watching satellite and that are watching cable and you don't want to alienate them," Berke said. "Down the road, the marketplace will increase and the economics could become feasible."[3]

142.    Further, because Comcast controls access to the majority of homes in the Denver DMA, with 92% of cable television consumers and 57% of all television consumers in the Denver DMA receiving their service from Comcast, Altitude cannot sell to another buyer in the Regional Sports Programming Market and have any hope of reaching enough viewers to remain a viable business.

---

[2] "Matt Hutchings, President of Altitude Sports Responds to Fans Questions on the Streaming/Direct to Consumer Options," Altitude Sports, https://www.altitudesports.com/pages/matt-hutchings-president-of-altitude-sports-responds-to-fans-questions-on-the-streamingdirect-to-consumer-options/.

[3] Ryan S. Clark, "A league of their own? It looks that way for Altitude when it comes to a new contract," The Athletic (Sep. 6, 2019), https://theathletic.com/1189469/2019/09/06/a-league-of-their-own-it-looks-that-way-for-altitude-when-it-comes-to-a-new-contract/.

**THE REASONS COMCAST HAS PROVIDED FOR DRAMATICALLY DEPARTING FROM ITS PAST COURSE OF DEALING WITH ALTITUDE ARE PRETEXTUAL.**

### A. Marketplace Trends Demonstrate that It Is Not Economically Rational for Comcast to Discontinue Providing Distribution of Altitude.

143.    Trends in the marketplace, and Altitude's performance, are not consistent with Comcast dramatically reducing Altitude's distribution and the licensing fees it had been paying Altitude.  RSN licensing fees, including those recently negotiated, are increasing.

144.    As RSN carriage agreements are expiring, the new carriage agreements that have been executed are for multi-year terms and provide for fee increases from the agreements they are replacing.  In particular, recent annual incremental increases of the industry-average affiliate fee have been in the 7% to 8% range.  Before Altitude was blacked out by Comcast, Altitude's performance, both in terms of viewership and advertising revenues, was rising in line with other RSNs.

### B. Local Sports Programming and RSNs Like Altitude Drive Subscribers to Stay with Cable and Not "Cut the Cord."

145.    As online streaming services like Netflix rise in popularity, MVPDs like Comcast are facing increased rates of "cord cutting," with subscribers opting to end their cable television subscription in favor of online streaming.

146.    Sports programming, and in particular local sports programming like the programming carried by Altitude and other RSNs, continues to be largely and in many cases only available through traditional cable and satellite subscriptions.

147.    For many customers, access to their local sports team's games is the only thing stopping them from cutting the cord.

148.    This makes carriage and telecast deals with RSNs like Altitude particularly important to Comcast.  If its subscribers start seeing their favorite sports programming disappear, Comcast is likely to see an increase in cord-cutting.

149.    In the Denver DMA specifically, many subscribers to Comcast subscribe for no reason other than to access Altitude's content, especially Avalanche and Nuggets games.

150.    Without access to Altitude, many Comcast subscribers have cancelled, or expressed an intent to cancel, their service.

151.    Comcast's negotiating tactics with Altitude have directly contributed to increased cord-cutting.  Given this, it makes no economic sense that Comcast continues to engage in this anticompetitive conduct, risking the loss of additional subscribers.

### C. Comcast Is Passing on the Cost of Carrying Altitude to its Subscribers and Is Even Making Money on Carrying Altitude in Some Cases.

152.    Comcast claims in public statements that Altitude is too expensive for it to continue to carry Altitude programming at its current rates.  This claim is inconsistent with the fees that Comcast charges its subscribers.

153.    In 2015, Comcast began charging its subscribers a monthly Regional Sports Fee in the amount of $1.00.  During the 2015 – 2019 time period, Comcast increased that fee in the Denver DMA by 800% to $8.00.   During that same time period, Comcast increased the rates that it paid Altitude by only a nominal amount each year.  The annual increases in Comcast's Regional Sports Fee therefore bore no relationship to any increase in the cost of carrying Altitude's programming.  These dramatic increases are an indicator of Comcast's market power.

154.    Under its just-expired contract with Altitude, and under Altitude's proposed fees for a continuing contract, Comcast would be paying Altitude per subscriber *less than half* of what it charges its subscribers in Regional Sports Fees.

155. Comcast is directly passing in excess of 100% of the cost of carrying Altitude on to its subscribers. Therefore any claims that Comcast would be losing money based on Altitude's proposed fees are untrue.

156. Further, this means that carrying Altitude is a net positive for Comcast. Not only is Comcast able to pass on more than the cost of carrying Altitude to its subscribers through the Regional Sports Fee, but it is separately making money as a result of the agreement through, for example, advertising revenue it obtains from advertisements it sells during an allotted advertising window on Altitude's programming. Comcast is also able to secure subscribers who might otherwise opt to cut their cord but subscribe to Comcast for the Altitude programming it carries, thus increasing overall subscribership.

157. Given this net positive outcome from carrying Altitude, it is economically irrational for Comcast to refuse to carry Altitude at Altitude's proposed rates.

158. Comcast is continuing to charge its subscribers the monthly Regional Sports Fee even while Altitude is blacked out, meaning Comcast has been charging customers for content it is no longer providing.

159. Comcast has started to provide a small, partial refund to customers of $1.25, but will not reimburse the full portion of the fee attributable to Altitude's programming.

160. In addition, as of October 2019, the Colorado Attorney General has opened an investigation into this Regional Sports Fee practice by MVPDs including Comcast. As part of this, the Attorney General is investigating whether Comcast has overcharged its customers during the Altitude blackout, including whether Comcast has engaged in "a deceptive trade practice" by continuing to charge its Regional Sports Fee during the blackout.

## COMCAST'S ANTICOMPETITIVE CONDUCT HAS HARMED ALTITUDE AND CONSUMERS.

161.    The anticompetitive conduct perpetuated by Comcast has harmed Altitude and consumers.

162.    Because of Comcast's willful conduct, Altitude has suffered and continues to suffer harm.  The harm takes multiple forms.

163.    Dramatically fewer sports fans can now view the games and team-related programming telecast on Altitude, so Altitude is losing the goodwill of its fans.  Since 2004, customers have been able to watch Nuggets and Avalanche games on Altitude without disruption.  Comcast has eroded their trust in Altitude and has caused Altitude reputational harm.

164.    Comcast has intentionally interfered with the contractual relationships and prospective business relationships between Altitude and its affiliated sports teams and advertisers.

165.    Reducing the number of subscribers Altitude reaches has a direct impact on Altitude's ability to collect subscriber fees, its ability to obtain advertising revenues, and ultimately its ability to retain its rights to the Nuggets and Avalanche games.

166.    Altitude has suffered a loss of subscriber fees and advertising revenues as compared to this point last year.  Absent Comcast's improper conduct, Altitude was reasonably likely to meet or exceed its amount of subscriber fees and advertising revenues from last year.

167.    Importantly, consumers have also suffered harm.  Through its anticompetitive conduct, Comcast has left most Nuggets, Avalanche, Mammoth, and Rapids fans in the Denver DMA without a way to watch the overwhelming majority of those teams' games.  Professional sports leagues televise relatively few of any one team's games on national television.  Some leagues offer products that allow fans to watch many more games (the "out of market products"

or "OOM products"). The NBA's version, for instance, is called "League Pass." But even these products are insufficient because OOM products have blackout restrictions that prevent their use for locally-televised games. Instead, OOM products point fans to their local RSN, who own licensing rights.

168. Comcast continues to charge its subscribers a fee for an RSN they can no longer watch. Even where Comcast has offered a partial refund, it has not offered a refund of the full cost.

169. Consumers are paying a fee for Altitude yet are not gaining the ability to watch the RSN.

170. Through its anticompetitive acts, Comcast seeks to foreclose competition and raise the prices paid by consumers.

## CLAIMS FOR RELIEF

## COUNT ONE:

## (Monopolization in Violation of the Sherman Act, Section 2)

171. Altitude realleges and incorporates by reference the allegations set forth in Paragraphs 1 to 170.

172. Count One is brought pursuant to Section 2 of the Sherman Act, 15 U.S.C. § 2 and the private right of action under Section 4 of the Clayton Act, 15 U.S.C. § 15.

173. Comcast has monopsony power in the Denver DMA Regional Sports Programming Market, which is the wholesale market for the purchase of regional professional sports programming (including or in the alternative the Professional Hockey Programming Market). Comcast willfully seeks to maintain that monopsony power by using anticompetitive conduct to force Altitude from the market, and then vertically integrate.

174. There is no legitimate business justification for Comcast's conduct.

35

175.    Comcast's conduct has the purpose and effect of harming competition and consumers.   Comcast knows that Altitude, as an independent RSN, cannot survive without sufficient distribution on Comcast and is taking all steps to cause Altitude to fail.

176.    Comcast's conduct has and will continue to harm consumers by reducing the quality and quantity of regional sports programming.   Further, Comcast has demonstrated through its billing practices that Comcast will use its power over consumer prices not to lower customers' bills but to take its customers' Regional Sports Fee as profit.

177.    Altitude has been harmed, and will continue to be harmed, by having fewer viewers, less advertising at reduced fees, and lost revenues from subscriber fees.  As a result, Altitude has suffered and will continue to suffer monetary damages in an amount to be proved at trial.

## COUNT TWO:

### (Attempted Monopolization in Violation of the Sherman Act, Section 2)

178.    Altitude realleges and incorporates by reference the allegations set forth in Paragraphs 1 to 170.

179.    Count Two is brought pursuant to Section 2 of the Sherman Act, 15 U.S.C. § 2 and the private right of action under Section 4 of the Clayton Act, 15 U.S.C. § 15.

180.    Comcast is attempting to acquire monopoly power in the Denver DMA Regional Sports Production Market, which is the market for the regional sports production in the Denver DMA (including or in the alternative the Professional Hockey Production Market), and has used—and continues to use—anticompetitive means to achieve this end.

181.    Comcast had a profitable prior course of dealing with Altitude.  Instead of continuing that relationship, Comcast is depriving Altitude of the subscriber fees and advertising

revenues it needs to remain financially viable. Comcast has no valid business justification for this action.

182. Comcast is acting with the specific intent to monopolize. Once Altitude is out of the market, Comcast intends to vertically integrate and replace Altitude.

183. Comcast's conduct harms competition. If successful, Comcast has a dangerous probability of monopolizing the Denver DMA Sports Production Market (including the Professional Hockey Production Market) as both a buyer and seller of sports programming in the Denver DMA, which would lessen or destroy competition in this market.

184. Comcast's conduct has and will continue to harm consumers by reducing the quality and quantity of regional sports programming. Further, Comcast has demonstrated through its billing practices that Comcast will use its power over consumer prices not to lower customers' bills but to take its customers' Regional Sports Fee as profit.

185. Altitude has been harmed, and will continue to be harmed, by having fewer viewers, less advertising at reduced fees, and the loss of revenues from subscriber fees. As a result, Altitude has suffered and will continue to suffer monetary damages in an amount to be proved at trial.

**COUNT THREE:**

**(Monopolization in Violation of the Colorado Antitrust Act)**

186. Altitude realleges and incorporates by reference the allegations set forth in Paragraphs 1 to 170.

187. Count Three is brought pursuant to the Colorado Antitrust Act, Colo. Rev. Stat. § 6-4-105.

188.     Comcast has monopsony power in the Denver DMA Regional Sports Programming Market, which is the wholesale market for the purchase of regional professional sports programming in the Denver DMA (including or in the alternative the Professional Hockey Programming Market).  Comcast willfully seeks to maintain that monopsony power by using anticompetitive conduct to force Altitude from the market, and then vertically integrate.

189.     There is no legitimate business justification for Comcast's conduct.

190.     Comcast's conduct has the purpose and effect of harming competition and consumers.  Comcast knows that Altitude, as an independent RSN, cannot survive without sufficient distribution on Comcast and is taking all steps to cause Altitude to fail.

191.     Comcast's conduct has and will continue to harm consumers by reducing the quality and quantity of regional sports programming.  Further, Comcast has demonstrated through its billing practices that Comcast will use its power over consumer prices not to lower customers' bills but to take its customers' Regional Sports Fee as profit.

192.     Altitude has been harmed, and will continue to be harmed, by having fewer viewers, less advertising at reduced fees, and lost revenue from subscriber fees.  As a result, Altitude has suffered and will continue to suffer monetary damages in an amount to be proved at trial.

## COUNT FOUR:

### (Attempted Monopolization in Violation of the Colorado Antitrust Act)

193.     Altitude realleges and incorporates by reference the allegations set forth in Paragraphs 1 to 170.

194.     Count Four is brought pursuant to the Colorado Antitrust Act, Colo. Rev. Stat. § 6-4-105.

195.    Comcast is attempting to acquire monopoly power in Denver DMA Regional Sports Production Market, which is the market for the production of regional professional sports programming in the Denver DMA (including or in the alternative the Professional Hockey Production Market), and has used—and continues to use—anticompetitive means to achieve this end.

196.    Comcast had a profitable prior course of dealing with Altitude. Instead of continuing that relationship, Comcast is depriving Altitude of the subscriber fees and advertising revenues it needs to remain financially viable.  Comcast has no valid business justification for this action.

197.    Comcast is acting with the specific intent to monopolize.  Once Altitude is out of the market, Comcast intends to vertically integrate and replace Altitude.

198.    Comcast's conduct harms competition.  If successful, Comcast has a dangerous probability of monopolizing the Denver DMA Sports Production Market (including the Professional Hockey Production Market) as both a buyer and seller of sports programming in the Denver DMA, which would lessen or destroy competition in this market.

199.    Comcast's conduct has and will continue to harm consumers by reducing the quality and quantity of regional sports programming.  Further, Comcast has demonstrated through its billing practices that Comcast will use its power over consumer prices not to lower customers' bills but to take its customers' Regional Sports Fee as profit.

200.    Altitude has been harmed, and will continue to be harmed, by having fewer viewers, less advertising at reduced fees, and the loss of revenues from subscriber fees.  As a result, Altitude has suffered and will continue to suffer monetary damages in an amount to be proved at trial.

## COUNT FIVE:

### (Tortious Interference with Contractual Relations)

201.    Altitude re-alleges and incorporates by reference the allegations set forth in Paragraphs 1 to 170.

202.    Comcast has tortiously interfered, and continues to interfere, with contracts between Altitude and its affiliated sports teams and advertisers.

203.    Comcast know that contracts existed between Altitude and its affiliated sports teams and advertisers.

204.    Comcast interfered, and continues to interfere, with Altitude's contracts with its affiliated sports teams and advertisers, intending to make it impossible for Altitude to perform those contracts.

205.    Comcast intentionally interfered, and continues to interfere, using improper and wrongful means including, but not limited to, engaging in anticompetitive conduct.

206.    As a result of Comcast's actions, Altitude has suffered, and will continue to suffer, reputational and financial harm in an amount to be proven at trial.

## COUNT SIX:

### (Tortious Interference with Prospective Business Relations)

207.    Altitude re-alleges and incorporates by reference the allegations set forth in Paragraphs 1 to 170.

208.    Comcast has tortiously interfered, and continues to interfere, with Altitude's prospective business relations with its affiliated sports teams and advertisers.

209.    Comcast intends to induce and cause Altitude's affiliate sports teams and advertisers not to enter into prospective relations with Altitude.

210.     Altitude was reasonably likely to continue prospective business relations with its affiliated sports teams and advertisers.

211.     Comcast intentionally interfered, and continues to interfere, using improper and wrongful means including, but not limited to, engaging in anticompetitive conduct.

212.     As a result of Comcast's actions, Altitude is suffering, and will continue to suffer, reputational and financial harm in an amount to be proven at trial.

## REQUEST FOR RELIEF

213.     WHEREFORE, Plaintiff prays that:

a.    A declaratory judgment be entered adjudging that Comcast's acts violate Section 2 of the Sherman Act (15 U.S.C. § 2) and the corresponding section of the Colorado Antitrust Act (Colo. Rev. Stat. § 6-4-105);

b.    A declaratory judgment be entered adjudging that Comcast tortiously interfered with Plaintiff's actual contracts with its affiliated sports teams and advertisers;

c.    A declaratory judgment be entered adjudging that Comcast tortiously interfered with Plaintiff's prospective business relations with its affiliated sports teams and advertisers;

d.    The Court award Plaintiff treble damages in an amount to be proven at trial, together with interest thereon;

e.    The Court award Plaintiff compensatory and punitive damages in an amount to be proven at trial, together with interest thereon;

f.    The Court award Plaintiff its attorneys' fees and costs;

41

g.   The Court enjoin Comcast from further violations of the Sherman Act and the Colorado Antitrust Act, and order Comcast to distribute Altitude's programming on reasonable, non-discriminatory terms; and

h.   The Court award Plaintiff such other and further relief as justice may require.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff requests a jury trial on all issues triable of right by a jury.

November 18, 2019                    BY:    */s/ William A. Isaacson*
                                            WILLIAM A. ISAACSON
                                            (wisaacson@bsfllp.com)
                                            AMY J. MAUSER
                                            (amauser@bsfllp.com)
                                            ROBERT M. COOPER
                                            (rcooper@bsfllp.com)
                                            BOIES SCHILLER FLEXNER LLP
                                            1401 New York Avenue, NW
                                            Washington, DC 20005
                                            Telephone: (202) 237-2727
                                            Fax: (202) 237-6131

                                            SEAN RODRIGUEZ
                                            (srodriguez@bsfllp.com)
                                            BOIES SCHILLER FLEXNER LLP
                                            44 Montgomery Street, 41st Floor
                                            San Francisco, CA 94104
                                            Telephone: (415) 293-6800
                                            Fax: (415) 293-6899

                                            KEVIN D. EVANS
                                            (kdevans@armstrongteasdale.com)
                                            ARMONSRONG TEASDALE
                                            4643 S. Ulster Street, Ste. 800
                                            Denver, CO 80237
                                            Telephone: (720) 200-0676
                                            Fax: (720) 200-0676

                                            *Attorneys for Plaintiff Altitude Sports &*
                                            *Entertainment, LLC f/k/a KSE Media*
                                            *Ventures, LLC*