**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 19-cv-3253-WJM-MEH

ALTITUDE SPORTS & ENTERTAINMENT, LLC,

      Plaintiff,

v.

COMCAST CORPORATION, and
COMCAST CABLE COMMUNICATIONS, LLC,

      Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART COMCAST'S
MOTION TO DISMISS ALTITUDE'S AMENDED COMPLAINT**

---

      This antitrust dispute is before the Court on Defendants Comcast Corporation
and Comcast Cable Communications, LLC's (jointly, "Comcast") Motion to Dismiss
Plaintiff Altitude Sports & Entertainment, LLC's ("Altitude") Amended Complaint (the
"Motion to Dismiss").  (ECF No. 48.)  Altitude filed a response in opposition (ECF No.
53), and Comcast replied (ECF No. 54) and filed two Notices of Supplemental Authority
(ECF Nos. 78, 89).  For the following reasons, the Motion to Dismiss is granted in part
and denied in part.

## I. BACKGROUND

      The following factual summary is drawn from Altitude's Amended Complaint
("AC") (ECF No. 38), except where otherwise stated.[1]  The Court assumes the
allegations contained in the AC are true for the purpose of deciding the Motion to

---

[1] It appears as though the AC is missing paragraphs 121 and 122.

Dismiss.  *See Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

### A.     Altitude

Altitude is an independent regional sports network ("RSN") that produces and telecasts regional sports programming, which is available throughout the Rocky Mountain region, including Colorado (the "Altitude Territory").  (¶¶ 5, 7.)[2]  The relevant geographic market in this action is the Denver Designated Market Area ("DMA"), which covers 70 counties in Colorado, Nebraska, and Wyoming.  (¶¶ 2, 31.)  The relevant product market is the market for regional sports programming (the "Regional Sports Programming Market"), in which Altitude is a seller of such programming, and Comcast is a buyer of the same.  (¶ 37.)  The Regional Sports Programming Market contains alternative relevant antitrust "submarkets," including the market for professional hockey programming (the "Professional Hockey Programming Market").[3]  (¶ 38.)

As a RSN headquartered in Denver, Altitude invests in licenses and purchases the rights to produce and telecast games of regional professional sports teams, including the National Hockey League's ("NHL") Colorado Avalanche, the National Basketball Association's Denver Nuggets, the National Lacrosse League's Colorado Mammoth, and Major League Soccer's Colorado Rapids.  (¶ 5.)  The only other RSN in

---

[2] Citations to paragraph numbers, without more, *e.g.* (¶ __), are citations to the AC. (ECF No. 38.)

[3] Altitude also refers to this market as the "Hockey Programming Submarket," the "Professional Hockey Programming Submarket," and the "Professional Hockey Submarket" in its response.  (ECF No. 53 at 10.)  These terms appear to be interchangeable with the "Professional Hockey Programming Market."

the Denver DMA is AT&T SportsNet Rocky Mountain, which is a vertically integrated multichannel video programming distributor ("MVPD") Affiliated RSN, owned and operated by AT&T, which also owns MVPD DIRECTV.[4]  (¶¶ 70, 99.)

In addition, Altitude produces and telecasts local and regional college and high school games and other entertainment-related content.  (¶ 5.)  To reach consumers, Altitude sells its programming to MVPDs, the "critical 'gatekeepers' to the ultimate consumers of sports programming—television viewers and sports fans in the Denver DMA."  (¶ 36.)  Simply put, MVPDs are distributors that sell sports programming to consumers as part of their television packages; they exert power over RSNs by extracting tolls that the RSNs must pay to stay viable.  (¶¶ 36, 46.)  They are "vertically integrated" from purchase through distribution to the consumer, so that the MVPD does not have to compete to acquire its own production and programming.  (¶¶ 71, 83.)  In addition to Comcast, Altitude's programming is carried by other buyers of such programming, including DIRECTV, Spectrum, and CenturyLink.  (¶ 164.)

**B.   Comcast**

Comcast is the largest MVPD in the United States and the dominant cable television provider in the Denver DMA.  (¶ 2.)  In the Denver DMA, 92% of cable customers have cable service through Comcast, and for most customers, Comcast is their only choice of cable provider.  (*Id.*)  However, the high cost of switching MVPDs protects Comcast's position; consumers often must choose the MVPD with existing infrastructure, rather than spend time and money installing a different MVPD's

---

[4] AT&T SportsNet Rocky Mountain currently holds the rights to produce and telecast Major League Baseball's Colorado Rockies.  (¶ 81.)

infrastructure, such as a direct broadcast satellite.  (¶¶ 34, 166.)  Comcast has spent decades building up its infrastructure and owns the physical cables that run throughout the Denver DMA and provide cable to Denver consumers.  (¶ 175.)

Of all the MVPDs in the Denver DMA (including cable and broadband satellite providers), Comcast has the largest market share of approximately 57%.  (¶¶ 2, 34.)  By comparison, the next largest MVPD, DIRECTV, has a market share of approximately 25%.  (¶ 2.)  Comcast's cable systems and MVPD market share in the Denver DMA make it a "monopsonist," or a purchaser with market power, over regional sports programming in the Denver DMA.  (¶ 8.)

Through its subsidiaries, Comcast also contracts with sports teams, leagues, conferences, and other entities to obtain the rights to produce and telecast sports programming, which it distributes to its subscribers and sells to other MVPDs to distribute to their subscribers.  (¶ 3.)  Comcast owns and distributes regional and national sports programming through its subsidiaries, including the NBC Sports Network ("NBCSN"), around the country.  (¶ 4.)

Comcast is one of three competitors in the Denver DMA who sell Professional Hockey Programming to MVPDs for downstream distribution to consumers.  (¶ 89.)  Those competitors include Comcast (through NBCSN), NHL Network (which Comcast owns in part), and Altitude.  (*Id.*)  Based on the amount of programming each competitor has for sale in the 2019–2020 regular NHL season, Altitude has a 26% share in the Professional Hockey Programming Market, Comcast has a 40.5% share with its NBC-branded products alone, and Comcast's share rises to 74% when including the NHL Network in which it has an ownership interest.  (*Id.*)  Were Comcast

4

to acquire Altitude, it would have a 66.5% to 100% share of the Professional Hockey Programming Market.  (*Id.*)

## C.      Relationship Between Altitude and Comcast

Comcast has carried Altitude programming since Altitude's launch in September 2004.  (¶¶ 8, 117.)  Comcast and Altitude signed a ten-year Affiliation Agreement under which Comcast paid Altitude a monthly per subscriber license fee and committed to carry Altitude in a widely distributed package of programming services on Comcast's cable systems; in exchange, Altitude granted Comcast a license to telecast Altitude's RSN programming within the Denver DMA and elsewhere within the Altitude Territory. (¶ 118.)  The Affiliation Agreement contained a minimum penetration provision requiring Comcast to carry Altitude on a cable package reaching at least 70% of its subscribers. (¶ 130.)

In August 2014, Comcast and Altitude renewed the Affiliation Agreement for another five years with higher fees to reflect the passage of time and align the rates with what Altitude saw as the market rate.  (¶¶ 131–32.)  The renewed contract was set to expire on August 31, 2019.  (¶ 133.)  In October 2018, Altitude proposed a two-year extension of the contract on its current terms.  (¶ 138.)  Comcast declined the offer.  (¶ 139.)  In February 2019, Altitude proposed a five-year contract renewal and offered rates similar to those under the current contract, with an industry-standard annual increase over the five years.  (¶ 140.)

In June 2019, Comcast responded to Altitude's proposal "with a draconian counter-proposal for rates and carriage that were entirely unreasonable and unworkable for Altitude . . . ."  (¶ 142.)  Comcast proposed a three-year contract which would

5

eliminate the minimum penetration requirement and change the monthly per subscriber fee to a flat base fee with an annual increase.  (¶ 143.)  In prior agreements, Altitude had access to 70% to 85% of Comcast subscribers on Comcast's "expanded basic" package.  (¶ 155.)  However, by moving Altitude to a "sports tier," Comcast's new proposal would have reduced Altitude's per subscriber fees and "drastically reduce[d]" Altitude's potential market penetration, lowering Altitude's access to 15% to 20% or less of Comcast subscribers.  (*Id.*)  Because accepting Comcast's terms would have put Altitude out of business, Altitude declined the offer.  (¶ 144.)

Although Altitude continued to negotiate, Comcast stated it would only enter a contract with Altitude on Comcast's terms and refused any attempts to reach a short-term solution while negotiations continued.  (¶ 145.)  In August 2019, Comcast rejected another offer by Altitude for a one-year extension of the current contract with the same terms to give the parties additional time to negotiate a long-term solution.  (¶ 147.)  With no renewed contract, on August 31, 2019, Comcast ceased distributing Altitude to its subscribers.  (¶¶ 161–62.)  Altitude remains blacked out and unavailable to all Comcast subscribers.  (¶ 162.)

In the short term, Comcast's negotiating strategy with Altitude has led to increased cord-cutting[5] and a consequent short-term loss in Comcast's profits.  (¶ 190.)  Thus, according to Plaintiff, Comcast's demands only make economic sense because, in the long-run, its anticompetitive conduct will eliminate Altitude from the market and

---

[5] Cable subscribers who opt to end their cable television subscription in favor of online streaming services such as Netflix or Hulu are called "cord-cutters."  (¶ 184.)  Because sports programming is typically only available through traditional cable or satellite subscriptions, it is often the only thing stopping customers from cutting the cord.  (¶¶ 185–86.)

yield profits.  (¶¶ 13, 14, 196.)  While it has refused to deal with Altitude, Comcast has not made similar demands or imposed drastic rate cuts or carriage reductions on its own affiliated RSNs throughout the country.  (¶ 12.)  Instead, for RSNs it owns, Comcast charges MVPDs per subscriber license fees and signs new contracts with rates equal to or higher than those it paid Altitude during their relationship.  (*Id.*) Altitude alleges that Comcast's strategy comports with its increased monopoly power over the years, which Comcast exercises by increasing consumer prices, rather than passing savings from vertical integration to consumers.  (¶¶ 50, 63.)  "As a result of its growth, Comcast is incentivized to further maximize its consolidated ownership by taking over the entire chain of regional sports programming, from production to distribution."  (¶ 108.)

Altitude further alleges that Comcast's refusal to reach an agreement with Altitude demonstrates that Comcast is trying to eliminate Altitude and take over the Regional Sports Programming Market; and that Comcast's pre-existing infrastructure from production facilities formerly used for Mountain West[6] and Comcast's resources[7] uniquely position Comcast to do so.  (¶ 91.)  Because it has the ability to vertically integrate and take over the entire chain of regional sports programming, from

---

[6] In 2006, Comcast worked with the Mountain West Conference of the National Collegiate Athletic Association (the "Mountain West Conference") to form the MountainWest Sports Network (informally known as "The Mountain"), which televised many of the conference's sporting events.  (¶ 78.)  Comcast operated The Mountain from its Comcast Media Center in Centennial, Colorado (less than six miles from Altitude's network operations center), which is the largest television and film studio in Colorado.  (¶ 79.)  In 2012, the Mountain West Conference realigned, and The Mountain stopped operating.  (¶ 80.)  Comcast maintains its studio, which will focus on Comcast-specific programming.  (*Id.*)

[7] In the third quarter of 2019, Comcast reported $26.8 billion in revenue.  (¶ 96.)

production to distribution, Comcast need not pay local RSNs (like Altitude) for content, allowing Comcast to realize even more profits.  (¶¶ 49, 108.)  In addition, Comcast can "substitute its own lower quality productions and move key operations and jobs out of Colorado and into centralized locations."  (¶ 49.)  In this manner, Comcast can keep consumer prices high and—even though it is no longer paying Altitude fees—continue to charge its subscribers a Regional Sports Fee.[8]  (¶¶ 10, 50, 192.)  In this manner, Comcast penalizes Altitude viewers with higher prices, forcing them to purchase a more expensive cable package to view Altitude's programming.  (¶ 158.)

Further, Altitude contends that Comcast has misled its customers by publicly stating that Altitude's price increases have increased costs for all of Comcast's customers in Colorado and Utah. (¶ 123.)  Comcast has also misrepresented that Altitude suffers from "lower viewership," which is why Comcast has chosen to black out Altitude.  (¶ 124.)  "Comcast knowingly made these false statements to harm Altitude, unfairly cast blame on Altitude for the blackout, and disrupt Altitude's actual and prospective business relationships."  (¶ 123.)  Comcast has also misrepresented its financial ability to continue to carry Altitude programming at its current rates.  (¶ 191.)

The AC further states that Comcast's anticompetitive conduct has harmed Altitude, consumers, and competition.  (¶ 200.)  Comcast has disrupted Altitude's

---

[8] The Regional Sports Fee is a fee on each consumer's monthly bill charged in addition to the monthly fee for the package of programming services that includes Altitude.  (¶ 10.) Altitude alleges Comcast offered "a token bill reduction (as a public relations move after consumer outcry)."  (¶ 63.)

In October 2019, the Colorado Attorney General opened an investigation into the Regional Sports Fee practice by MVPDs, including Comcast.  (¶ 199.)  In connection with the matter, the Colorado Attorney General is investigating whether Comcast has overcharged its customers during the Altitude blackout and has engaged in a deceptive trade practice by continuing to charge its Regional Sports Fee during the blackout.  (*Id.*)

relationship with its fans, who can no longer watch its programming, and with Denver-based professional sports teams, making it more difficult for Altitude to fulfill its contractual obligations to those teams.  (¶¶ 202–03.)  Comcast has intentionally interfered with contractual relationships and prospective business relationships between Altitude and its advertisers.  (¶ 204.)  Specifically, the disruption to Altitude's business has made it more expensive and burdensome for Altitude to fulfill its contractual obligations to its advertisers, who, due to the blackout, reach fewer subscribers.  (¶¶ 205–06.)  Altitude identifies advertising contracts with Miller Coors, Jeep, and Papa John's as having been disrupted, causing Altitude financial harm.  (¶ 207.)

In addition, consumers suffer.  Most consumers now cannot watch Denver sports teams' games and are still being charged at least a partial Regional Sports Fee for programming they can no longer watch.  (¶¶ 213–14.)

Altitude alleges that competition, too, suffers.  With the elimination of Altitude, the only independent RSN, from the Regional Sports Programming Market, "Comcast is ensuring that all remaining RSNs will be vertically integrated MVPD-affiliated RSNs."  (¶ 218.)  Comcast's actions increase barriers to entry and ensure that only RSNs with vertically integrated distribution in the geographic area will be able to afford to compete; independent RSNs like Altitude will be pushed out of the market.  (*Id.*)

Currently, AT&T SportsNet Rocky Mountain (vertically integrated and affiliated with AT&T, owner of MVPD DIRECTV) is the only other RSN in the market.  (¶ 219.)  "If and when Comcast fills the vacuum in the market left by Altitude and creates yet another Comcast-affiliated RSN, Comcast will become a second MVPD-affiliated RSN in the market."  (¶ 220.)  With fewer incentives to compete and create a high-quality

product for MVPD-affiliated RSNs, competition will suffer.  (¶¶ 221–22.)  Moreover, even if Comcast does not replace Altitude in the market, competition suffers nonetheless by the elimination of one of the only two participants in the Regional Sports Programming Market.  (¶ 223.)  If AT&T SportsNet Rocky Mountain had no competitors, its incentive to compete on price, innovation, or any other competitive aspect of the market would be extinguished.  (*Id.*)

## II. PROCEDURAL HISTORY

On November 18, 2019, Altitude filed its Complaint (ECF No. 1), which Comcast moved to dismiss (ECF No. 30).  On January 23, 2020, United States Magistrate Judge Michael Hegarty entered a Scheduling Order.  (ECF No. 35.)  The Scheduling Order provides that the deadline for initial disclosures under Federal Rule of Civil Procedure 26(a)(1) was January 16, 2020.  (*Id.* at 10.)  The deadline for amendment of pleadings was March 9, 2020.  (*Id.* at 17.)

On February 4, 2020, Altitude filed its AC, alleging six claims: (1) monopolization in violation of the Sherman Act, Section 2, 15 U.S.C. § 2 (¶¶ 224–30); (2) attempted monopolization in violation of the Sherman Act, Section 2 (¶¶ 231–38); (3) monopolization in violation of the Colorado Antitrust Act, Colo. Rev. Stat. § 6-4-105 (¶¶ 239–45); (4) attempted monopolization in violation of the Colorado Antitrust Act (¶¶ 246–53); (5) tortious interference with contractual relations (¶¶ 254–59); and (6) tortious interference with prospective business relations (¶¶ 260–65).  Altitude requests relief in the form of declaratory judgment on all claims, trebled compensatory damages, punitive damages, and injunctive relief under the antiturust laws of the United States, for

compensatory and punitive damages and injunctive relief under state law, and attorneys' fees and costs.  (¶¶ 1, 266.)

On February 28, 2020, Comcast moved to dismiss Altitude's AC.  (ECF No. 48.) The Motion to Dismiss became ripe for review on April 10, 2020.  (ECF No. 54.)

On March 16, 2020, Judge Hegarty issued his Order Granting In Part Comcast's Motion to Stay Discovery, temporarily staying discovery until April 30, 2020.  (ECF No. 50 at 4.)  On April 29, 2020, Judge Hegarty issued the Order Permitting Limited Discovery, permitting limited discovery proposed by Altitude.  (ECF No. 56.)  The parties have filed Joint Status Reports (ECF Nos. 55, 71) and have participated in a status conference (ECF No. 77) with Judge Hegarty.  In the Joint Status Report filed on April 27, 2020, the parties suggested that adjustments to the Scheduling Order would likely be required but proposed waiting until the Court ruled on the Motion to Dismiss to recommend such deadlines.  (ECF No. 55 at 4, 7 n.5.)  The parties filed another Joint Status Report on November 23, 2020 (ECF No. 93), and the next status conference with Judge Hegarty is set for November 30, 2020 (ECF No. 85).

### III. LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a claim in a complaint for "failure to state a claim upon which relief can be granted."  The Rule 12(b)(6) standard requires the Court to "assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the plaintiff."  *Ridge at Red Hawk*, 493 F.3d at 1177.  In ruling on such a motion, the dispositive inquiry is "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 570 (2007)).  Granting a motion to dismiss "is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice."  *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (internal quotation marks omitted).  "Thus, 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'"  *Id.* (quoting *Twombly*, 550 U.S. at 556).

## IV. ANALYSIS

In the Motion to Dismiss, Comcast argues the AC should be dismissed for multiple reasons: (1) the challenged conduct—Comcast's decision not to accede to Altitude's negotiation demands—is, at most, a lawful unilateral refusal to deal; (2) the pleaded facts show that Comcast is not a monopsonist in the "relevant market," and has no plausible prospect of achieving monopoly power in any relevant market; (3) Altitude fails to plead antitrust injury because it alleges facts showing harm to itself but not the requisite harm to competition; and (4) Altitude's tortious interference claims are legally insufficient.  (ECF No. 48 at 8–9.)

### A.   Antitrust Claims[9]

Section 2 of the Sherman Act makes it unlawful to "monopolize" or "attempt to

---

[9] Colorado's antitrust statute generally tracks the provisions of federal law. *See JTS Choice Enters., Inc. v. E.I. DuPont De Nemours & Co.*, 2014 WL 793525, at *4 n.3 (D. Colo. Feb. 26, 2014) (citing *People v. N. Ave. Furniture & Appliance, Inc.*, 645 P.2d 1291, 1295–96 (Colo. 1982) (looking to federal law interpreting the Sherman Act and the Clayton Act for guidance)).  Accordingly, the Court will discuss only the federal claims, and its analysis applies equally to the claims brought under the Colorado statutes.  *Id.*

monopolize."[10]  15 U.S.C. § 2.  To succeed on a monopolization claim, Altitude must allege: (1) monopoly power in the relevant market; (2) willful acquisition or maintenance of this power through exclusionary conduct; and (3) harm to competition.  *See Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 762 F.3d 1114, 1119 (10th Cir. 2014) (citations omitted).

To establish attempted monopolization, Altitude must allege: (1) predatory or anticompetitive conduct; (2) a specific intent to monopolize; and (3) a dangerous probability of achieving monopoly power.  *See id.* at 1129 (citing *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1192 (10th Cir. 2009)).

1.     *Monopolization*[11]

The Court begins its analysis of the monopolization claim with the third element, harm to competition, as its analysis on this issue is dispositive of the claim.  "The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior."  *Total Renal Care, Inc. v. W. Nephrology & Metabolic Bone Disease, P.C.*, 2009 WL 2596493, at *5 (D. Colo. Aug. 21, 2009) (citing *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990) (emphasis in original)).  In other words, a plaintiff "must prove *antitrust*

---

[10] "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court."  15 U.S.C. § 2.

[11] Altitude pleads a "monopolization" claim in Count One but bases that claim on the theory that Comcast is a "monopsonist" in the Regional Sports Programming Market.  (¶¶ 8, 226.)

injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Full Draw Prods. v. Easton Sports, Inc.*, 182 F.3d 745, 750 (10th Cir. 1999) (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (emphasis in original)).  To state a claim, "the injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation."  *Id.*

In the AC, Altitude alleges Comcast's actions have harmed it and consumers. (¶¶ 200–16.)  Additionally, Altitude has also alleged that Comcast has harmed competition in the Regional Sports Programming Market by eliminating Altitude.[12]  (¶ 218.)  By eliminating the only independent RSN in the market,

> Comcast is ensuring that all remaining RSNs will be vertically integrated MVPD-affiliated RSNs.  This increases barriers to entry and ensures that, going forward, only RSNs with vertically integrated distribution in the geographic area will be able to afford to compete in the Regional Sports Programming Market.

(*Id.*)  The remaining RSN in the market would be AT&T SportsNet Rocky Mountain, which is vertically integrated and affiliated with AT&T, owner of MVPD DIRECTV.  (¶ 219.)  Altitude alleges that such MVPD-affiliated RSNs have fewer incentives to compete with each other and create a quality product because they are vertically integrated; they are guaranteed carriage on affiliated RSNs and can survive in the market regardless of how vigorously they compete.  (¶ 221.)

Should Comcast permanently eliminate Altitude and replace it in the Regional

---

[12] Comcast disputes the contention that Altitude has been "eliminated," arguing that "the complaint shows that Altitude has not been eliminated and continues to be carried by DIRECTV and other distributors."  (ECF No. 54 at 13.)

Sports Programming Market, as an MVPD-affiliated RSN, Comcast would not have to compete to buy the product it formerly bought from Altitude.  (¶ 222.)  Instead, Altitude alleges that following vertical integration, Comcast would be guaranteed access to Altitude's content and has the existing ability to distribute the content to consumers without competing with other MVPDs over price and terms of carriage.  (*Id.*)

Moreover, even if Comcast does not replace Altitude in the market, Altitude alleges competition is harmed nonetheless.  (¶ 223.)  Without Altitude's participation in the market, AT&T SportsNet Rocky Mountain would be the only RSN in the Denver DMA.  (*Id.*)

> [A]lthough there are other limited-capacity competitors in the Regional Sports Programming Market in National MVPD Sports Networks, because the professional sports leagues limit the amount of sports programming each can produce, they are not meaningful competitors on the same level as Altitude and AT&T SportsNet Rocky Mountain.  AT&T SportsNet Rocky Mountain would essentially be left without competitors in the market, and its incentive to compete on price, innovation or any other competitive aspect of the market would be extinguished.

(*Id.*)

In the Motion to Dismiss, Comcast argues that Altitude has pled no injury to competition.  (ECF No. 48 at 18–19.)  Relevant here, Comcast characterizes the AC's allegations as equating "Comcast's share of television subscribers with its share of the relevant market, and alleges that not carrying Altitude is causing Comcast to *lose* subscribers, and thus *lose* market share—the opposite of maintaining market power." (*Id.* at 18 (citing ¶¶ 186, 189, 190).)  In the reply, Comcast attempts to further clarify this argument and reiterates that

> Rather than plead harm to competition on the "buy side" of the programming market, Altitude contends that Comcast will lose subscribers—*diminishing* any power Comcast has as a buyer.  Mot. 13.  Altitude does not even try to show that Comcast's conduct will maintain Comcast's alleged power as a buyer.  This alone is a basis to dismiss the monopsonization claims.

(ECF No. 54 at 12.)

The Court agrees.  Even assuming without deciding that Altitude has alleged harm to competition on the "sell side" of the market because (as described in detail above) one of two competitors is at least temporarily, and possibly permanently, eliminated from selling regional sports programming in the Denver DMA, as Comcast explains, Altitude has not sufficiently alleged harm to competition on the "buy side" of the market.[13]

Altitude cites *Full Draw* and other cases for the proposition that, even if Comcast does not take Altitude's place as a seller in the Regional Sports Programming Market, "when a market already has few competitors, the elimination of one harms competition." (ECF No. 53 at 19 & n.8 (citing *Full Draw*, 182 F.3d at 750–51; *Total Renal Care*, 2009 WL 2596493, at *5 ("attempts to eliminate a competitor and thus lessen competition" were sufficient at the pleading stage) (footnote citations omitted).)  The Tenth Circuit's conclusion in *Full Draw* that "alleging the loss of one of two competitors in this case alleges injury to competition" is relevant to Altitude's allegations of harm on the "sell

---

[13] Although Altitude's response does not mention paragraph 222, to the extent Altitude relies on that paragraph to support harm to competition on the "buy side," the Court finds the allegation insufficient.  There, Altitude alleges "Comcast will no longer have to compete to buy the product it once purchased from Altitude," but does not sufficiently explain the harm to competition in the buyer's market.  Because the Court finds it may be difficult but not impossible for Altitude to plead the requisite harm, the claim will be dismissed without prejudice.

side," as Altitude and AT&T SportsNet Rocky Mountain are the two competitors selling regional sports programming in the Denver DMA. *Full Draw*, 182 F.3d at 754. However, the Court remains unconvinced that *Full Draw* supports Altitude's deficient allegations of harm to competition on the "buy side" of the market. Therefore, the Court finds the monopolization claim must at this time be dismissed without prejudice.[14]

    2.    *Attempted Monopolization*

        (a)    <u>Anticompetitive Conduct</u>

            (i)    <u>Altitude Has Alleged Anticompetitive Conduct</u>

Simply being a monopoly is not barred by the Sherman Act; "the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*." *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) (emphasis in original); *see also TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1024–25 (10th Cir.1992) ("Conduct violates [Section 2] where an entity acquires or maintains monopoly power in such a way as to preclude other entities from engaging in fair competition."). The Tenth Circuit has observed that "anticompetitive conduct comes in too many forms and shapes to permit a comprehensive taxonomy." *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013) (citations omitted). "Put simply, the monopolist's conduct must be irrational but for its anticompetitive effect." *Id.* at 1075 (citation omitted).

Altitude alleges that

    [t]hrough its actions, Comcast is using its position as the

---

[14] Because the Court concludes the third element of a monopolization claim fails, it need not address the sufficiency of the allegations regarding the first two elements of that claim.

> dominant purchaser and distributor of regional sports programming in the Denver DMA to decrease the carriage of Altitude and increase the costs for Altitude customers, foreclosing Altitude's access to the majority of Denver DMA households.  Exclusionary conduct is not limited to certain refusals to deal, it also includes conduct "that totally or partially 'forecloses' competitors from access either to critical inputs or customers, with the effect of causing them to raise their prices or reduce their output, thereby allowing the excluding firm to profit by setting a supra-competitive output price, with the effect of harming consumers."  Steven C. Salop, *The Raising Rivals' Cost Foreclosure Paradigm, Conditional Pricing Practices, and the Flawed Incremental Price-Cost Test,* 81 Antitrust L.J. 371, 376 (2017).

(¶ 16.)  Specifically, Altitude argues Comcast engages in the following forms of anticompetitive conduct: (1) foreclosing Altitude's access to consumers by only offering Altitude distribution in the sports tier and requiring consumers to pay a fee or penalty on top of subscription and regional sports fees (¶¶ 65, 155, 158); (2) using the Altitude blackout as a step in its larger scheme to vertically integrate Altitude's programming into Comcast's other NBC-branded sports programming; and (3) making misrepresentations concerning Altitude to harm its reputation and relationships with customers.  (ECF No. 53 at 12–14.)

Comcast argues that Altitude has failed to plead the essential element of anticompetitive conduct.  (ECF No. 48 at 9.)  Comcast's primary argument focuses on its characterization of its own actions as permissible "hard bargaining" and Altitude's allegations as, at most, "a lawful unilateral refusal to deal on Altitude's preferred terms." (*Id.*)  Concluding Altitude has failed to plead a refusal to deal claim, Comcast also asserts no other antitrust theory is availing to Altitude.  (*Id.* at 12.)

First, Comcast contends its decision to offer Altitude a contract which distributes

18

Altitude's programming on a sports tier is "far from a 'penalty'" on Altitude viewers but "an entirely permissible way to distribute content to those who want it, and the marketplace will determine if Comcast's judgment is correct."  (*Id.* at 13.)  As such, Comcast asserts its conduct was not anticompetitive, and that "antitrust laws do not compel an alleged monopolist to 'lend smaller [firms] a helping hand.'"  (*Id.* (citation omitted).)

Second, Comcast argues that there is "no merit to Altitude's theory that Comcast is 'raising rivals' costs,' by which Altitude means raising Altitude's costs."  (*Id.*)  Comcast reiterates that it is not Altitude's rival.  (*Id.*)

Third, Comcast disputes any theory that it will leverage its purported monopsony into monopoly power as a seller of RSN programming, as such a theory is "baseless and cannot support liability."  (*Id.* at 14.)

Fourth, Comcast argues an "essential facilities" claim would also fail, as the Supreme Court disowned that doctrine in *Trinko*.  (*Id.* (citing *Trinko*, 540 U.S. at 410–11).)  Even if the doctrine survived, Comcast argues Altitude has nonetheless failed to plead such a claim.[15]  (*Id.*)

Fifth, Comcast argues that while Altitude has alleged "predatory demands" (¶ 8), it has not alleged predatory bidding.  (*Id.*)

Finally, Comcast argues Altitude's allegations that Comcast seeks to vertically integrate and launch a RSN to replace it do not amount to an allegation of anticompetitive conduct.  (*Id.* at 14–15.)  Instead, Comcast asserts "Altitude's leap from

---

[15] Altitude appears to not address this argument in its response.  (*See* ECF No. 53.)

Comast's transactions in other cities from over a decade ago to a forecast of Comcast's future actions in Denver is completely speculative, and implausible, and should not be credited."  (*Id.* at 15.)

The Court has carefully considered Comcast's numerous, persuasive arguments. Of course, "a legitimate buyer is entitled to use its market power to keep prices down." *Kartell v. Blue Shield of Mass., Inc.*, 749 F.2d 922, 929 (1st Cir. 1984).  And, as Comcast emphasizes, "a firm that has substantial power on the buy side of the market (*i.e.*, monopsony power) is generally free to bargain aggressively when negotiating the prices it will pay for goods and services."  *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 103 (3d Cir. 2010) (citations omitted).  Such principles reflect courts' hesitation to condemn unilateral behavior and thus chill vigorous competition. *See id.* (citing *Am. Needle, Inc. v. NFL*, 560 U.S. 183 (2010)).  "In the event, however, that the monpposonist maintains its market power on the buy side of the market through anticompetitive or predatory conduct, the monopsonist is equally as culpable as the monopolist in violating Section 2."  *New Mexico Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs.*, 54 F. Supp. 3d 1189, 1214 (D.N.M. 2014) (citing *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1118 (10th Cir. 2008)).

"Anticompetitive conduct can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties."  *SolidFX, LLC v. Jeppesen Sanderson, Inc.*, 935 F. Supp. 2d 1069, 1080 (D. Colo. 2013), *aff'd*, 841 F.3d 827 (10th Cir. 2016) (quoting *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1087 (D.C. Cir. 1998) (internal quotation marks

omitted)).  Here, Comcast has allegedly targeted Altitude as an independent RSN and agreed to offer Altitude programming only in the sports tier package as opposed to the expanded basic package, which significantly limits Altitude's market penetration (from 70%–85% down to 15%–20%), and requires consumers to pay a fee in addition to their subscription and regional sports fees.  (¶¶ 64, 65, 155, 158.)  By contrast, "Comcast's own sports programming in the Denver DMA or other geographic markets remains penalty-free."  (ECF No. 53 at 12 (citing ¶¶ 151–60).)

But that is not all of the anticompetitive conduct Altitude has alleged. Additionally, Altitude alleges the blackout was only one step in Comcast's larger anticompetitive scheme to build its position in the Regional Sports Programming Market, whereby Comcast can now vertically integrate Altitude's programming into Comcast's video and other NBC-branded sports programming.  (*Id.* at 12–13.)  To bolster its intent to vertically integrate and oust Altitude from the market, Comcast also allegedly made misrepresentations blaming Altitude for the Regional Sports Fee and rising prices (¶¶ 123, 191), damaging Altitude's reputation and relationships with customers.  (*Id.* at 13.)

At least one court in the Tenth Circuit has observed that "[a] refusal to deal may cross the line from permissible to predatory, and therefore satisfy the second element of a monopsonization/monopolization claim, if its purpose is vertically to integrate into the supplier's market."  *N.M. Oncology*, 54 F. Supp. 3d at 1215.  Although Comcast characterizes Altitude's allegations that it will enter the market with its own RSN as baseless and speculative, viewing the allegations in the light most favorable to Altitude, and drawing all reasonable inferences in Altitude's favor, as the Court must at the

dismissal stage, the Court finds Altitude has alleged facts sufficient to show that its allegations of anticompetitive conduct are plausible.

(ii)   <u>Altitude Has Also Alleged Anticompetitive Conduct in the Form of Comcast's Refusal to Deal</u>

"The leading case for § 2 liability based on refusal to cooperate with a rival . . . is [*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985)] ." *Trinko*, 540 U.S. at 408. Liability based on refusal to deal requires: (1) "a preexisting voluntary and presumably profitable course of dealing between the monopolist and the rival," *Novell*, 731 F.3d at 1074; (2) "the monopolist's discontinuation of the preexisting course of dealing must suggest a willingness to forsake short-term profits to achieve an anti-competitive end," *id.* at 1075 (alterations in original omitted); and (3) "a showing that the monopolist's refusal to deal was part of a larger anticompetitive enterprise," *id.*

In the Motion to Dismiss, Comcast argues Altitude has failed to sufficiently allege conduct constituting a refusal to deal. (ECF No. 48 at 9–12.) First, Comcast argues Altitude has failed to allege prior dealings between a monopolist and a rival, as Comcast was Altitude's customer, not its competitor. (*Id.* at 11.)

Second, Comcast characterizes the allegation that it took a short-term profit loss in the form of increased cord-cutting as conclusory and contradicted by the AC's allegation that Comcast's programming costs "dropped dramatically" because it was no longer paying fees to Altitude and that Comcast pocketed the savings. (*Id.* (citing ¶¶ 19–20, 63, 190, 229); ECF No. 54 at 8.) Comcast critiques the AC's failure to show that the losses from cord-cutting offset Comcast's cost savings. (ECF No. 48 at 11.)

Third, Comcast contends Altitude fails to plead that Comcast engaged in conduct

22

that was "irrational but for its tendency to harm competition." (*Id.*)  Rather, Comcast underscores that the AC pleads the purpose of procompetitive cost savings in the form of reduced programming expenses.  (*Id.*)

However, for the following reasons, at the dismissal stage, the Court finds Comcast's arguments unavailing.  First, Altitude has alleged Comcast had a profitable prior course of dealing with Altitude for at least 15 years.  (¶¶ 8, 117–18, 131–32.) Indeed, Comcast does not dispute this allegation.  Instead, Comcast focuses on the "rival" aspect of the first element of a refusal to deal, arguing it is no rival of Altitude's.[16] However, as explained below, Altitude has (barely) sufficiently alleged that Comcast (as a rapid entrant) is a competitor in the Regional Sports Programming Market, or alternatively, the Professional Hockey Programming Market.

Next, Altitude has alleged that Comcast has suffered short-term losses, as "many Comcast subscribers have cancelled, or expressed an intent to cancel, their service," in the wake of the blackout, reducing Comcast's subscription and advertising revenue.  (¶¶ 188–90, 194–96.)  Comcast's argument that the AC's allegations of decreased expenses leading to increased profits raises factual issues that the Court cannot resolve at this pleading stage.  At bottom, Altitude has alleged that "Comcast's negotiating tactics with Altitude have directly contributed to increased cord-cutting and, as a result, a loss in short-term profits to Comcast."  (¶ 190.)  The allegation is thin, but plausible.  Whether Altitude can support the allegation with sufficient evidence to

---

[16] Altitude seems to dodge this argument by not addressing whether Comcast is a rival and instead claiming that with its argument, "Comcast is not denying whether a duty to deal has been pled, but has shifted its arguments to those discussed in Section I above as well as a standing argument."  (ECF No. 53 at 16.)

withstand summary judgment is a matter for another day.

Finally, as explained above, Altitude has alleged that Comcast has engaged in a larger competitive enterprise including Comcast's refusal to deal with Altitude and renew their agreement.  And to the extent Comcast argues Altitude has failed to plead conduct that was "irrational but for its tendency to harm competition," *Novell*, 731 F.3d at 1076, the Court disagrees.  Altitude has alleged that marketplace trends show it is not economically rational for Comcast to stop distributing Altitude, given that Altitude's performance in terms of viewership and advertising revenues was rising before the blackout, and that without access to Altitude, many Comcast customers have cancelled or expressed intent to cancel their service.  (¶¶ 182–89.)  Altitude alleges that carrying its programming is a "net positive" for Comcast; Comcast can pass on more than the cost of carrying Altitude to subscribers through the Regional Sports Fee, separately makes money selling advertising during an allotted window on Altitude's programming, and secures subscribers who might otherwise cut the cord because it carries Altitude's programming.  (¶ 195.)  "Given this net positive outcome from carrying Altitude, it is economically irrational for Comcast to refuse to carry Altitude at Altitude's proposed rates."  (¶ 196.)  The Court concludes that these allegations sufficiently allege irrational conduct but for its tendency to harm competition.[17]

---

[17] To the extent Comcast argues the AC pleads a procompetitive purpose of cost savings in the form of reduced programming expenses, which it argues is fatal to a duty to deal claim as a matter of law (ECF No. 48 at 11), the Court finds this argument more appropriate for the summary judgment stage of the litigation.  While the existence of a valid business justification for a monopolist to refuse to deal may preclude § 2 liability, *see Aspen Skiing*, 472 U.S. at 605–06, "courts have generally recognized that the existence of a business justification is not properly determined on a motion to dismiss," *Steward Health Care Sys., LLC v. Blue Cross & Blue Shield of Rhode Island*, 997 F. Supp. 2d 142, 152 (D.R.I. 2014); *see also Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 460 (7th Cir. 2020) ("Thus, balancing

(b)      Specific Intent to Monopolize

Altitude alleges that "Comcast is acting with specific intent to monopolize." (¶ 235.)  Specifically, "[o]nce Altitude is out of the market, Comcast intends to vertically integrate and replace Altitude as a seller in the Regional Sports Programming Market." (*Id.*)  Altitude acknowledges that Comcast currently does not produce regional sports programming in the Denver DMA but points out that Comcast used to do so and maintains active facilities to do so.  (¶ 39.)  Moreover, Altitude alleges that "Comcast intends to take over regional sports programming in the Denver DMA, and it can do so immediately upon extinguishing competition from Altitude."  (*Id.*)

Comcast argues that the AC "baselessly speculates" that Comcast will replace Altitude as a Denver RSN.  (ECF No. 48 at 7.)  The Court has carefully considered Comcast's argument regarding the speculative nature of the allegations, not only as to specific intent, but as to the entire attempted monopolization claim as a whole. However, given the parties' prior course of dealing for nearly 15 years, Comcast's seemingly abrupt shift in requiring specific contractual terms like the sports tier and elimination of the minimum market penetration requirement, refusal to negotiate with Altitude, and the factual allegations regarding Comcast's infrastructure and financial means giving it the ability to vertically integrate with relative ease, the Court finds Altitude has plausibly alleged that Comcast intends to monopolize and replace Altitude

---

anticompetitive effects against hypothesized justifications depends on evidence and is not amenable to resolution on the pleadings, at least where the plaintiff has alleged conduct similar to that in *Aspen Skiing*.").  Even considering Comcast's assertion that the AC itself provides the procompetitive purpose, the Court agrees with the other courts which have found that "[c]onsideration of procompetitive justifications must wait for a comprehensive rule of reason analysis."  *Viamedia*, 951 F.3d at 461.

as a seller in the Regional Sports Programming Market.

As the Court has noted elsewhere in this Order, whether Altitude can prove Comcast's specific intent to monopolize is an entirely different matter—one the Court views with some skepticism, particularly in light of Comcast's argument that replacing Altitude would not make Comcast a monopolist because of AT&T SportsNet Rocky Mountain's presence in the market (ECF No. 48 at 18).  But this issue is joined here in the Rule 12 context, and "[t]he threshold of sufficiency that a complaint must meet to survive a motion to dismiss is exceedingly low, and Rule 12(b)(6) dismissals are particularly disfavored in fact-intensive antitrust cases."  *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.,* 376 F.3d 1065, 1070 (11th Cir. 2004) (citing *Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp., S.A.*, 711 F.2d 989, 994–95 (11th Cir. 1983)).

(c)    Dangerous Probability of Achieving Monopoly Power

"The third element of an attempted monopolization claim [(dangerous probability of achieving monopoly power)] requires consideration of 'the relevant market and the defendant's ability to lessen or destroy competition in that market.'"  *SolidFX*, 935 F. Supp. 2d at 1084 (quoting *Christy Sports*, 555 F.3d at 1192).

Altitude alleges that Comcast has a high probability of successfully monopolizing the Denver DMA's Regional Sports Programming Market because it is a monopsonist and multimarket firm, has deep pockets, has experience operating RSNs, and has the ability to quickly produce Denver DMA regional sports programming using its existing facilities—including facilities in Denver.  (¶ 75.)  Moreover, Comcast's dominance in the Professional Hockey Programming Market demonstrates it is already successfully

26

monopolizing a market, and shows the ease with which it will monopolize the larger Regional Sports Programming Market, which includes the Professional Hockey Programming Market.  (¶ 76.)

Specifically, Altitude alleges Comcast is a competitor in the Regional Sports Programming Market for at least two reasons.  First, "Comcast has an existing market share as a seller in the Regional Sports Programming Market because of its subsidiary NBCSN's national telecasts of regional sports programming," which includes Colorado Avalanche games.  (¶ 77.)  Second, consistent with what the Department of Justice Horizontal Merger Guidelines calls a "rapid entrant," Comcast is considered a "direct competitor" with Altitude for purposes of antitrust analysis.  (*Id.*)  Though Comcast does not currently own or operate a RSN in the Denver DMA, Comcast's market power, MVPD Affiliated RSN infrastructure, pre-existing infrastructure from The Mountain, national sports programming presence, and resources provide it with the ability to rapidly launch a RSN in Denver and quickly take over the Regional Sports Programming Market.  (¶¶ 77, 91.)

Although Comcast does not currently produce regional sports programming in the Denver DMA, Altitude alleges Comcast used to do so, and maintains active facilities for producing sports programming in Denver.  (¶ 39.)  Altitude alleges that Comcast intends to take over regional sports programming in the Denver DMA, and can do so immediately upon putting Altitude out of business.  (*Id.*)

> Comcast's dominance over the downstream distribution market—and corresponding market power as a monopsonist over the Regional Sports Programming market—has implications for this case.  First, it enhances Comcast's power to exclude competition in the Regional Sports

> Programming Market.  Second, it makes Comcast likely to
> succeed in monopolizing the Regional Sports Programming
> Market.  Third, it gives Comcast strong incentives to
> monopolize the Regional Sports Programming Market by
> taking over regional sports programming from local
> dependents.

(¶ 45.)  Altitude alleges that Comcast's dominance over distribution and its historical pattern of "extinguishing" local regional sports networks and taking over their programming demonstrate that Comcast is "especially likely to succeed in monopolizing the Regional Sports Programming Market."  (¶ 47.)

In the Motion to Dismiss, Comcast disputes the allegations that there is a dangerous probability it will gain monopoly power as a seller in the Regional Sports Programming Market.  (ECF No. 48 at 16.)  Comcast argues it is "implausible" that Altitude's owner would let it replace Altitude and disputes the characterization that it is a rapid entrant in the market.  (*Id.*)  Comcast underscores that Altitude's "novel argument" that Comcast is a rapid entrant is "unprecedented and flies in the face of the Supreme Court's admonition that the facts of *Aspen* were 'at or near the outer boundary of § 2 liability."  (ECF No. 54 at 7.)

Comcast extrapolates the effects of Altitude's rapid entrant theory, positing that if Altitude can state a claim by speculating the Comcast might enter Altitude's market after refusing to buy Altitude's programming, then no distributor could ever, without threat of a lawsuit, remove a product from its shelves.  (*Id.*)  Ultimately, Comcast argues, courts would become regulators of the prices and terms on which a distributor must carry a producer's goods or face antitrust penalties; under these circumstances, Comcast contends Altitude's rapid entrant theory must be rejected.  (*Id.* at 7–8.)

Further, Comcast identifies three additional reasons negating the dangerous probability it will obtain monopoly power as a result of the failed negotiations with Altitude, namely: (1) its market share as a seller, which it states is zero, should be considered; (2) Altitude has failed to establish a dangerous probability that it will monopolize the Denver market, instead relying on allegations of Comcast's actions 13–23 years ago;[18] and (3) replacing Altitude would not make Comcast a monopolist because AT&T SportsNet Rocky Mountain is another RSN in Denver.  (*Id.* at 16–18.)

In connection with its argument that it has zero market share as a seller, Comcast also contests Altitude's allegations regarding its power in the Professional Hockey Programming Market.  (*Id.* at 17.)  Specifically, Comcast distinguishes its telecasting of NHL games on NBCSN from RSN programming, stating that NBCSN is not a RSN and does not telecast RSN programming.  (*Id.*)  Rather, "NBCSN is a national network that purchases its professional hockey rights from the NHL and telecasts NHL programming nationally."  (*Id.*)  Thus, Comcast contends NBCSN does not compete in the Denver DMA Regional Sports Programming Market or the Professional Hockey Programming Market.  (*Id.*)

The Court acknowledges the strength of Comcast's arguments.  However, the Court remains mindful it is assessing the plausibility of Altitude's allegations on a motion to dismiss.  Viewed in that light, Altitude's allegations of a dangerous probability of that Comcast will gain monopoly power as a seller in the Regional Sports Programming

---

[18] Altitude alleges that over the past two decades, between 1997 and 2007, Comcast had a strategy involving launching or acquiring RSNs in cities where Comcast had vertical integration.  (¶¶ 109–13.)

Market pass muster.  The key inquiry in evaluating this element is the power of the defendant in the market in which it competes.  *Nat'l Ass'n of Inv'rs Corp. v. Bivio, Inc.*, 2013 WL 316021, at *5 (D. Colo. Jan. 28, 2013) (internal quotation marks and citation omitted).  "To evaluate a defendant's market power, at the very least it must be shown how much of the relevant market a defendant controls."  *Id.* (internal quotation marks and citation omitted).

Under the Department of Justice and Federal Trade Commission Horizontal Merger Guidelines § 5.1, "[f]irms that are not current producers in a relevant market, but that would very likely provide rapid supply responses with direct competitive impact in the event of a SSNIP, without incurring significant sunk costs, are also considered market participants.  These firms are termed 'rapid entrants.'"  *See* U.S. Dep't of Justice and Fed. Trade Comm'n, *Horizontal Merger Guidelines* § 5.1 (Aug. 19, 2010), https://www.justice.gov/atr/horizontal-merger-guidelines-08192010#5a, *last visited* Nov. 16, 2020.[19]

Again, the Court remains mindful of Comcast's emphasis on the fact that it does not compete as a seller in the Regional Sports Programming Market (ECF No. 54 at 12), a fact Altitude acknowledges (¶ 77 ("Though Comcast does not currently own or operate an RSN in the Denver DMA . . . .")).  The Court also acknowledges Comcast's point that Altitude has not cited a case holding that a zero market share defendant had

---

[19] Courts have used the Horizontal Merger Guidelines in defining the relevant market in antitrust cases.  *See, e.g., Horst v. Laidlaw Waste Sys., Inc.*, 917 F. Supp. 739, 744 (D. Colo. 1996); *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 335 (S.D.N.Y. 2001), *as modified*, 183 F. Supp. 2d 613 (S.D.N.Y. 2001), and *aff'd*, 344 F.3d 229 (2d Cir. 2003), and *enforced*, 2007 WL 1741885 (S.D.N.Y. June 15, 2007).

a dangerous probability of monopolizing a market.  (ECF No. 54 at 12.)  But, while

Comcast cites cases explaining that the expansion of liability in this manner may

exceed the bounds of § 2 liability, (ECF No. 54 at 7 (citing *Trinko*, 540 U.S. at 409, and

*Novell*, 731 F.3d at 1074)), it does not cite Tenth Circuit authority definitively showing

that Altitude's novel theory is legally impermissible—particularly at the dismissal stage.

Moreover, Altitude cites authority that stands for the proposition that analyzing

whether a firm is a rapid entrant is a "fact-intensive inquiry."  (ECF No. 53 at 10 (citing

*United States v. Bazaarvoice, Inc.*, 2014 WL 203966 (N.D. Cal. Jan. 8, 2014) (deciding

rapid entry based on evidentiary record) and *FTC v. Tronox Ltd.*, 322 F. Supp. 3d 187

(D.D.C. 2018) (same).)  Under these circumstances, the Court concludes that Altitude

has sufficiently alleged that Comcast's infrastructure and financial means enable

Comcast to switch production rapidly to launch a RSN without incurring significant sunk

costs, making it a plausible rapid entrant.  (ECF No. 53 at 10 (citing ¶¶ 77–80, 91–98,

101).)  Despite the arguable weakness and novelty of this argument (which will be

carefully scrutinized on a future motion for summary judgment), Altitude has alleged

numerous other factors supporting its position that the Court finds persuasive at this

juncture.

To bolster allegations of Comcast's dangerous probability of achieving monopoly

power, Altitude also points to the high barriers to entry in the Regional Sports

Programming Market (¶ 92),[20] Comcast's existing programming from its other RSNs

---

[20] Specifically, such barriers to entry include: the development of sports production facilities, acquisition of local sports television rights, ability to access distribution channels, product differentiation, operational expertise, and a sufficient amount of sports programming to occupy a network.  (¶ 92.)

throughout the country that is ready to be deployed in the Regional Sports

Programming Market (¶ 94), Comcast's brand recognition through its national sports

networks like NBCSN (¶ 95), Comcast's significant financial resources (¶ 96),

Comcast's production facilities at the Comcast Media Center, which include terrestrial

fiber connectivity to acquire video from Denver sports arenas, sophisticated studios,

and a content operations center (¶¶ 97–98), and the existence of just one competitor

(AT&T SportsNet Rocky Mountain) that lacks monopsony power in the Regional Sports

Programming Market (¶ 99).  (ECF No. 53 at 10.)  Despite Comcast's zero market

share in the Regional Sports Programming Market, Altitude's allegations that it has a

dangerous probability of rapidly entering the market and monopolizing it are plausible.[21]

The Court also finds Comcast's arguments that NBCSN does not compete in the

Denver Regional Sports Programming Market or the Professional Hockey Programming

submarket unavailing at the dismissal motion stage of the litigation.  As Altitude points

out (*id.* at 9), "[i]t is well settled that defining the relevant market is an issue of fact,"

*Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 305 F.3d 1124, 1131 (10th Cir. 2002)

(citation omitted); Altitude has alleged that, given Comcast's alleged participation in the

Professional Hockey Programming Market (between 40.5% and 74%) and the

anticompetitive conduct in which Comcast has allegedly already engaged, there is a

dangerous probability that Comcast will monopolize that market.  (ECF No. 53 at 10; ¶

_____

[21] Based on Comcast's arguments, particularly its zero market share as a seller in the Regional Sports Programming Market, the Court views Altitude's attempted monopolization claim as having a significantly difficult road ahead should the case proceed to summary judgment, but the Court must view the allegations in the light most favorable to Altitude at the dismissal stage.

89.)  Were Comcast to replace Altitude in the hockey submarket, Comcast's market

share would rise to between 66.5% and 100%.  (*Id.*)  Therefore, the Court finds Altitude

has sufficiently alleged its alternative theory on this point: that there is a dangerous

probability that Comcast will monopolize the Professional Hockey Programming

Market.[22]

## B.    Tortious Interference Claims

To state a claim of tortious interference with business relations, a plaintiff must

show that the defendant intentionally and improperly induced or prevented a third

_____

[22] In its briefing footnotes, Comcast appears to contest whether Altitude has properly alleged a relevant market in connection with the Professional Hockey Programming Market. (ECF No. 48 at 17 n.9 ("In any event, Altitude does not allege that Avalanche games telecast by NBCSN are substitutes for the *different* Avalanche games telecast by Altitude.  *Novell*, 731 F.3d at 1071 (products in the same market must be substitutable).  NBCSN telecasts twelve Avalanche games a year (AC ¶ 85), which is, at most, an immaterial share of the alleged relevant submarket.") (emphasis in original); ECF No. 54 at 8 n.4 (disputing that Comcast and Altitude do business in the same market and contrasting Comcast's national networks, national hockey rights purchasing, and telecast of NHL matches on a national basis with Altitude's regional network purchasing regional hockey rights and telecasting Avalanche matches on a regional basis).)

In response, Altitude argues that "[i]n the Denver DMA, consumers have a unique demand for Avalanche hockey games and view the Altitude and Comcast networks as interchangeable suppliers of such programming.  (ECF No. 53 at 10 (citing ¶¶ 84–89).) Further, Altitude disputes Comcast's contention that RSN and national telecasts of games are not interchangeable because a hockey viewer cannot switch from Altitude to NBC to watch the same game, stating that "defining a market game by game runs against courts' strong preference not to limit a market to one brand."  (*Id.* at 10 n.3 (citation omitted).)

The Court acknowledges the general high quality of the briefing in this case—except in this context, where both parties present substantial arguments about the definition of an alleged market in their footnotes, without sufficient development to aid the Court.  To the extent this issue is presented again in any subsequent motion practice, the Court expects counsel will more thoroughly examine these complex legal and factual issues.

Accordingly, the Court finds Comcast's argument too underdeveloped for proper analysis, and nonetheless, as noted above, defining the relevant market is a factual issue, which is not suitable for resolution on a motion to dismiss.  As Comcast's argument appears to implicate factual issues regarding, among other things, whether specific games are interchangeable and programming on national versus regional networks, the Court cannot resolve these arguments at this stage.

person to not enter into or continue a business relationship with the plaintiff. *ClearCapital.com, Inc. v. Computershare, Inc.*, 2019 WL 1573300, at *3 (D. Colo. Apr. 11, 2019) (citing *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 500 (Colo. 1995); Restatement (Second) of Torts, § 766B (1979)).

"Tortious interference with a prospective business relation requires a showing of intentional and improper interference preventing formation of a contract." *Autotech Techs., LP v. Palmer Drives Controls & Sys., Inc.*, 2020 WL 1974759, at *4 (D. Colo. Apr. 24, 2020) (citing *Amoco Oil*, 908 P.2d at 500).  Courts consider seven factors in determining whether intentional interference is improper: the nature of the actor's conduct, the actor's motive, the interests of the other with which the actor's conduct interferes, the interests sought to be advanced by the actor, the social interests in protecting the freedom of action of the actor and the contractual interests of the other, the proximity or remoteness of the actor's conduct to the interference, and the relations between the parties.  *See Amoco Oil*, 908 P.2d at 500 (citing Restatement (Second) of Torts § 767) (explaining the weight carried by these factors may vary).

Altitude alleges that various misrepresentations by Comcast have disrupted Altitude's actual and prospective business relationships (¶¶ 258, 264), including:

> In an attempt to explain away its anticompetitive conduct, Comcast has publicly claimed that Altitude's price increases have "driven up costs for all of our customers in Colorado and Utah."  This statement ignores the fact that the increase in the RSN fee that Comcast charges to its customers far exceeds the rate at which Altitude's fees have increased over the same time period.  Comcast knowingly made these false statements to harm Altitude, unfairly cast blame on Altitude for the blackout, and disrupt Altitude's actual and prospective business relationships.

(¶ 123.)

> Comcast has similarly misrepresented that Altitude suffers from "lower viewership" and this is why Comcast has chosen to blackout Altitude.  Altitude's total ratings have experienced significant growth in recent years.  The network's overall ratings increased 70% from the 2016–2017 season to the 2017–2018 season and increased 63% from the 2017–2018 season to the 2018–2019 season.

(¶ 124.)

> Comcast claims in public statements that Altitude is too expensive for it to continue to carry Altitude programming at its current rates.  This claim not only misrepresents Altitude's financial viability and the value of its programming, but also is inconsistent with the fees that Comcast charges its subscribers.

(¶ 191.)

In arguing for dismissal of Altitude's tortious interference claims, Comcast raises the competitor privilege doctrine and pleading deficiencies under Federal Rules of Civil Procedure 8 and 9(b).  (ECF No. 48 at 19–20.)  Comcast contends it had an absolute right not to renew the contract because it expired by its own terms.  (*Id.* (citing ¶ 133).)  Next, Comcast asserts the AC fails to comply with Federal Rule of Civil Procedure 9(b)'s requirement that claims based on misrepresentations plead with particularity "the time, place, and contents of the false representation, the identity of the party making the false statements, and the consequences thereof."  (*Id.*)  Finally, Comcast argues the AC fails to identify any affected prospective relationship.  (*Id.* at 20.)

"In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).

Comcast notes that the tortious interference claims are at least partly based on misrepresentations, and argues they are not pled with the particularity required by Rule 9(b).  (ECF No. 48 at 19 (citing ¶¶ 258, 264).)  *See Purac Am. Inc. v. Birko Corp.*, 2015 WL 1598065, at *6 (D. Colo. Apr. 8, 2015) (dismissing intentional interference with a prospective business advantage claim for failure to allege who made the false statements to customers or when and where statements were made in accordance with Rule 9(b)).  Further, Comcast contends the AC fails to allege facts demonstrating the statements were misrepresentations or had any consequences on Altitude's business.  (ECF No. 48 at 20.)  To the contrary, Comcast views the AC as establishing the *truth* of the statement regarding increasing costs, citing allegations that Comcast's costs fell dramatically when it stopped paying Altitude (¶ 63) and that Altitude demanded continued annual fee increases (¶ 140).  (*Id.*)  Comcast also takes issue with Altitude's failure to provide "context to support any plausible inference that 'lower viewership' was false or misleading."  (*Id.*)

In response, Altitude contests that it must allege the misrepresentations in accordance with Rule 9(b), instead arguing it must only allege—and did allege—that Comcast knowingly made a false statement, intended to cause others to rely on that statement, and harmed Altitude.  (ECF No. 53 at 20.)  Altitude emphasizes that Comcast's statements in the Motion to Dismiss demonstrate it has sufficient notice of the representations, notwithstanding any Rule 9(b) deficiency.  (*Id.* (citing ECF No. 48 at 15).)  Finally, Altitude argues it need not allege why the statements were false, as no Tenth Circuit case imposes such a requirement.  (*Id.*)

The Court agrees with Comcast, and finds that Altitude has failed to allege the fraudulent misrepresentations with the sufficient particularity necessary to satisfy Rule 9(b).  Altitude's theory is that Comcast knowingly made misrepresentations and false statements to explain away its anticompetitive conduct, which resulted in a disruption of Altitude's actual and prospective business relationships.  (¶ 123.)  Altitude alleges Comcast's interference is intended not only to make it impossible for Altitude to perform its existing contracts with Denver-based professional sports teams and advertisers  (¶¶ 255–59), but also "intend[ed] to induce and cause Altitude's affiliate sports teams and advertisers not to enter into prospective relations with Altitude" (¶ 262).

As the *Purac* court found, "[i]n the context of a tortious interference claim, 'the heightened pleading standard [of Rule 9(b)] only applies to the fraudulent inducement element of the tortious interference claim."  2015 WL 1598065, at *6 (citing *Dawson v. Litton Loan Servicing, LP*, 2013 WL 1283848, at *8 (D. Colo. Mar. 28, 2013); *N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale*, 567 F.3d 8, 14 (1st Cir. 2009) (Rule 9(b) applies where "fraudulent misrepresentation is the lynchpin" of tortious interference claim)).  While Altitude does not invoke the term "fraud" in the AC, that is the essence of the claims: Comcast's intentional misrepresentations were designed to interfere with existing and future contracts.  Although neither party has provided any binding Tenth Circuit precedent, the Court elects to follow the analysis set out in *Purac* and dismiss Altitude's tortious interference claims without prejudice.  *See id.* (dismissing defendant's counterclaim that plaintiff induced defendant's customers to end their relationships with defendant by making false statements to the customers without

prejudice for failure to satisfy Rule 9(b)).[23]

## C.   Request for Punitive Damages

In the AC, Altitude requests punitive damages under state law.  (¶¶ 1, 266(e).)  In the Motion to Dismiss, Comcast argues that if any state law claims survive, the Court should dismiss or strike Altitude's demand for punitive damages because Colorado law prohibits such a demand in an initial pleading.[24]  (ECF No. 48 at 20 n.12 (citing Colo. Rev. Stat. § 13-21-102(1.5)(a) and *Glaser v. Jordan*, 2010 WL 1268151, at *2 (D. Colo. Mar. 30, 2010)).)  Altitude does not address Comcast's argument regarding punitive damages.  (*See* ECF No. 53.)

"Under Colorado law, a litigant is entitled to an award of exemplary (*i.e.*, punitive) damages if the wrong done . . . is attended by circumstances of fraud, malice, or willful and wanton conduct[.]"  *Cahey v. Int'l Bus. Machs. Corp.*, 2020 WL 5203787, at *15 (D. Colo. Sept. 1, 2020) (citing Colo. Rev. Stat. § 13-21-102(1)(a)).  However, an initial complaint cannot contain a request for exemplary damages; only after the parties exchange initial disclosures may a party move to amend her pleading to include such a request and only if she "establishes *prima facie* proof of a triable issue."  *Id.* (citing *Residences at Olde Town Square Ass'n v. Travelers Cas. Ins. Co. of Am.*, 413 F. Supp.

---

[23] Because the Court dismisses the tortious interference claims on Rule 9(b) grounds, it need not address Comcast's alternative arguments for dismissal of these claims.

[24] "A claim for exemplary damages in an action governed by this section may not be included in any initial claim for relief.  A claim for exemplary damages in an action governed by this section may be allowed by amendment to the pleadings only after the exchange of initial disclosures pursuant to rule 26 of the Colorado rules of civil procedure and the plaintiff establishes *prima facie* proof of a triable issue.  After the plaintiff establishes the existence of a triable issue of exemplary damages, the court may, in its discretion, allow additional discovery on the issue of exemplary damages as the court deems appropriate."  Colo. Rev. Stat. § 13-21-102(1.5)(a).

3d 1070, 1073 (D. Colo. 2019)).  If the movant has presented *prima facie* proof of a triable issue of exemplary damages, a court will permit the movant to amend the pleadings to add a claim for exemplary damages.  *See Kassinove v. McClendon*, 2017 WL 4277184, at *2 (D. Colo. Sept. 27, 2017).  Should the movant fail to satisfy the Federal Rule of Civil Procedure 15, Federal Rule of Civil Procedure 16, or the exemplary damages standard, denial of the motion is appropriate.  *Id.*

"Courts in this District have found no conflict between Colo. Rev. Stat. § 13-21-102 and the Federal Rules of Civil Procedure and have held that Colo. Rev. Stat. § 13-21-102 controls whether to permit amendment of a pleading to assert a request for exemplary damages."  *Cahey*, 2020 WL 5203787, at *15 (citing *Wollam v. Wright Med. Grp., Inc.*, 2012 WL 4510695, at *9 (D. Colo. Sept. 30, 2012); *Witt v. Condos. at the Boulders Ass'n*, 2006 WL 348086, at *7 (D. Colo. Feb. 13, 2006)).

According to the Scheduling Order entered on January 23, 2020, the parties' Rule 26(a)(1) disclosures were due by January 16, 2020.  (ECF No. 35 at 10.)  Therefore, given the length of time that has transpired since then, while it appears as though Altitude may have complied with the disclosure portion of the requirements of § 13-21-102(1.5)(a), it has yet to be determined whether Altitude has established *prima facie* proof of a triable issue.  Under these circumstances, and because the tortious interference claims are to be dismissed, the Court will strike Altitude's request for punitive damages which is predicated on its tortious interference claims.

## V. CONCLUSION

For the foregoing reasons, the Court ORDERS as follows:

1.   Defendants Comcast Corporation and Comcast Cable Communications, LLC's

     Motion to Dismiss Plaintiff Altitude Sports & Entertainment, LLC's Amended

     Complaint (ECF No. 48) is GRANTED in part and DENIED in part, as follows:

     a.   Altitude's claims of monopolization in violation of the Sherman Act,

          Section 2 (¶¶ 224–30), and monopolization in violation of the Colorado

          Antitrust Act, Colo. Rev. Stat. § 6-4-105 (¶¶ 239–45), are DISMISSED

          without prejudice;

     b.   Altitude's claims for tortious interference with contractual relations (¶¶

          254–59) and tortious interference with prospective business relations (¶¶

          260–65) are DISMISSED without prejudice;

     c.   Altitude's request for punitive damages under state law (¶¶ 1, 266) is

          STRICKEN, insofar as it is predicated on the tortious interference

          claims;[25] and

     d.   The Motion to Dismiss is DENIED in all other respects.

2.   The Court is aware that the parties will appear before Judge Hegarty for a status

     conference on November 30, 2020.  (ECF No. 87.)  The Court DIRECTS the

     parties to be prepared to discuss with Judge Hegarty the issue of resetting the

     deadline to amend the pleadings at that status conference.[26]

---

[25]  In reaching this conclusion, the Court in no way suggests Altitude cannot seek to later amend its complaint pursuant to Colo. Rev. Stat. § 13-21-102(1.5)(a), and expresses no opinion as to the merits of such a request.

[26] As it pertains to all subsequent briefing in this case, if the parties are reasonably of the view that briefs in excess of the page limits allowed under WJM Revised Practice Standards III.C.1 are necessary, the Court urges counsel to consider a request for a moderate amount of extra pages to permit sufficient development of factual and legal issues.

3.    The partial stay of discovery (ECF No. 50) is LIFTED.


Dated this 25th day of November, 2020.

BY THE COURT:


_____
William J. Martinez
United States District Judge

41